CASE 92—AGREED CASE—MAY 24.

# *Stone, Auditor, v. Pryor, Etc.

APPEAL FROM FRANKLIN CIRCUIT COURT.

1. CONSTITUTIONAL LAW—CHANGE OF OFFICERS' SALARIES.—The "Court of Appeals of Kentucky" created by the Constitution of 1891, to go into effect the first of January, 1895, is a new court, and the provision of section 112 of the Constitution that the judges of that court should "receive for their services an adequate compensation to be fixed by law" not having theretofore been complied with, the act of March 6, 1894, fixing the salary of each of said judges at $5,000 per annum is not violative of the provision of section 235 of that instrument that "the salaries of public officers shall not be changed during the term for which they were elected," as to those judges who were either elected under the old Constitution, or elected under the new Constitution before the passage of that act, and who under the provisions of section 115 of the Constitution continued in office after the first of January, 1895, as part of the new court, although the effect of that act was to increase their salaries; that act merely fixed the salaries of the judges of the new court, and did not change them as they had not theretofore been fixed.

2. STATUTORY CONSTRUCTION.—The second section of the act of March 6, 1894, providing that "the provisions of this act shall not apply to the incumbents during the present term of their office" had reference alone to the judges of the old court from the time of the adoption of the act until the organization of the new court; and this construction brings about the equality in salaries contemplated by the provision of section 112 of the Constitution that "they shall at stated times receive for their services an adequate compensation to be fixed by law."

W. S. TAYLOR FOR APPELLANT.

1. The judges are public officers, and their terms of office commenced before the adoption of the present Constitution, and continued long afterwards, and the provisions of section 235 of the Consti-

---

*Chief Justice Lewis and Judge Hazelrigg being parties to this action, the Hon. A. T. Wood of Mt. Sterling and the Hon. O. H. Waddle of Somerset were appointed by the Governor as special Judges to act in this case with the other regular Judges.

tution meant to apply to them. It can not be said that the framers of the Constitution continued the term of the judges then in office, and at the same time provided that the Legislature might change the salary during their term, in the face of the plain provisions of section 235. Ky. Constitution, secs. 235, 161, 96, 246, 106 and 97; City of Louisville v. Wilson, 99 Ky., 603; Bright v. Stone, 19 Ky. Law Rep.; 5 Dakota, 129; Cain v. Norman, 17 Ky. Law Rep., 494; Commonwealth v. Adams, 16 Ky. Law Rep., 135; Sutherland on Statutory Construction, secs. 235-6-7-8, 178 and 179; 11 Ind., 482; 62 Wis., 376; 118 U. S., 90.

2. The second section of the act of March 6, 1894, provides that it shall not apply to the incumbents during their present term of office, and it would be a strained and unnatural construction to say that the Legislature in that act contemplated that the appellees, who under the express terms of the Constitution continued in office, began a new term upon the organization of the court the first of January, 1895.

W. H. HOLT and EDWARD W. HINES for appellees.

1. Under the provisions of the Constitution of 1891 the Court of Appeals organized on the first of January, 1895, was a new court, and all legislation after the adoption of the new Constitution relating to the Court of Appeals must be presumed to be looking forward to that date; and as it is provided in section 112 of the Constitution that the judges of that court were to receive for their services "an adequate compensation to be fixed by law," it must be presumed that that compensation was to be equal and uniform. Purcell v. Parks, 82 Ill., 346; State v. McDowell, 19 Neb., 442; Louisville v. Wilson, 99 Ky.; Acts of 1894, p. 66; Constitution of Ky., secs. 112, 113, 115, 235, 117 and 133; Cooley's Constitutional Limitations, pp. 69, 70, 71 and 72; 95 Ky., 590.

2. The use of the expression "their present term of office" instead of their "present terms of office" in the act of March 6, 1894, indicates clearly that it was intended to apply only to the term up to the organization of the new court.

T. L. EDELEN on same side.

1. The General Assembly in section 2 of the act of March 6, 1894, meant by "the present term of their office" that portion of their

Stone, Auditor, v. Pryor, etc.

services which shall elapse prior to the organization of the new court in January, 1895.

2. The Constitution requires a uniform compensation and if section 2 of the act of 1894 was intended to create a difference in the compensation of the different judges, it is unconstitutional and void.

3. Courts will not put upon the statute a construction, which will render it violative of the organic law if it is susceptible of an-. other construction.

4. It is not until the salary has been fixed under the provisions of section 112 of the Constitution that the provisions of section 235 can become operative as to the judges of this court.

C. P. CHENAULT AND GUY H. BRIGGS ON SAME SIDE.

1. The Constitution of 1891 established a Court of Appeals for the Commonwealth, to go into effect the first of January, 1895, and its members after that date are members of a new court and not of the old one. Constitution, secs. 109, 110, 111, 112 and 113; Piper v. Gunther, 95 Ky., 115.

2. The act of March, 1894, fixed for the first time the salaries of the members of this new court, and there is, therefore, no change of salary in the sense of the Constitution. State v. McDowell, 19 Neb., 442; Purcell v. Parks, 82 Ill., 347; City of Louisville v. Wilson, 99 Ky.

SPECIAL JUDGE WOOD DELIVERED THE OPINION OF THE COURT.

This is an agreed case submitted to the judge of the Franklin Circuit Court on agreed facts, which are, in substance, as follows:

That appellant, Stone, is the Auditor of Public Accounts of the State of Kentucky; that appellees, W. S. Pryor, Joseph H. Lewis and James H. Hazelrigg, were each judges of the Court of Appeals at the time of the institution of this action; that Judge Pryor was elected in 1888, Judge Lewis in 1890, and Judge Hazelrigg in November, 1892; that Judge Pryor's term expired January 1, 1897, that Judge Lewis' term will expire January 1, 1899, and Judge Hazel-

rigg's, January 1, 1901; that they were then filling said offices; that there was due said Judges Pryor, Lewis and Hazelrigg their respective salaries for the month of January, 1896; that they presented to said auditor their claims for said salary for said month of January, and demanded of him a warrant for $416,66 2-3 for said month; that said auditor refused to issue a warrant for such amount, but tendered a warrant to each of said judges for $333.33 1-3, which said judges declined to accept; that said judges contended that, under the laws of this State, their salaries were $5,000 each per annum, the auditor contending that, under said laws, they were only entitled to $4,000 each per annum; and the appellees (plaintiffs below) asked the court for a mandamus against the the auditor to compel him to issue his warrant for said sum of $416.66 2-3 in favor of each of said judges.

Upon the final hearing of this case, the Franklin Circuit Court entered judgment directing the auditor to draw his warrant on the treasurer of the State in favor of each of said judges on account of salaries as judges of the Court of Appeals, at stated times, as provided by law, in such amounts as would not exceed the sum of $5,000 per annum each; and from that judgment the auditor has appealed.

In order to a proper solution of this question, we will have to review, to some extent, the new Constitution. We use the word "new" with reference to the present Constitution, because it is, in every sense of the word, a new Constitution. While many of the threads of the old Constitution were retained in the new, yet it is essentially a new instrument.

The Bill of Rights is different from that in the old Constitution. The election law provisions are radically different. The provisions pertaining to municipalities, revenue and taxation, education, corporations, railroads and commerce, are also different from the old Constitution. Much of it—especially that pertaining to muncipalities, corporations and railroads and commerce—was not in the old Constitution.

There is a radical change in the courts. All common pleas, criminal and chancery courts were abolished by the new Constitution, as likewise the superior court, after January 1, 1895.

The Court of Appeals as established by the new Constitution is entirely different from that provided for in the old Constitution. By section 113, it was provided that after 1894, the Court of Appeals should consist of not less than five nor more than seven judges; and by section 115, it was provided that the judges then in office should hold their offices until their respective terms expired—until their successors were elected. It was further provided by said section that the General Assembly should, before the regular election in 1894, provide for the election of such judges of the Court of Appeals, not less than five nor more than seven; and section 116 provided that the judges of the Court of Appeals should be elected by districts, and that the General Assembly should provide, before the regular election of 1894, for dividing the State, by counties, into as many districts as there were judges to be elected; and in pursuance of this section the Legislature, on June 17, 1893 (Ky. Stats., section 936), did divide the State into seven

districts, and the judges were to be elected one from each of said districts at the November election, 1894, except those districts where the judges then in office were permitted to hold their offices until their time expired, thus creating a new Court of Appeals, composed of seven judges. And the Constitution further provided (section 118), that, if the court was composed of seven judges, it should divide itself into sections, for the transaction of business, if, in the judgment of the court, such arrangement was necessary.

The framers of the new Constitution, and the people who adopted it, could have provided that the terms of all the judges then in office should expire with the regular election in November, 1894. They could have provided that the Governor should appoint these judges for a given time. The only restriction upon the people in making the Constitution was, that it should be republican in form and not in conflict with the Constitution of the United States. Therefore, these judges were kept in office, you may say, by grace, in order that no injustice might be done; and they were to become members of the new court on the 1st of January, 1895, at which time all the judges elected at the November election, 1894, were to take office. By the terms of section 115 of the new Constitution, the terms of the judges then in office were extended four months each.

By article 4, section 3 of the old Constitution, it was provided that the judges of the Court of Appeals should, at stated times, receive for their services an adequate compensation, to be fixed by law, which should not be diminished during the term for which they were elected. It will be seen from this provision of the old Constitution that

the salaries of the judges of the old court could not be diminished during their terms. of office, but could be increased.

Section 112 of the new Constitution provides: "The judges of the Court of Appeals shall severally hold their offices for a term of eight years, commencing on the first Monday in January next succeeding their respective elections, and until their several successors are qualified, subject to conditions hereinafter prescribed. For any reasonable cause, the Governor shall remove them, or any one or more of them, on the address of two thirds of each House of the General Asssmbly, the cause or causes for which said removal shall be stated at length in such address and in the Journal of each House. They shall, at stated times, receive for their services an adequate compensation, to be fixed by law."

In 1880, the salaries of the judges of the Court of Appeals were fixed at $4,000 per anum. This act was in force at the time of the election of the appellees, and at the time the new Constitution took effect, September 28, 1891. On March 4, 1894 (Acts 1894), p. 66), the Legislature, in pursuance of the mandate of the Constitution (section 112), proceeded to fix the salaries of the judges of the Court of Appeals. Said act reads as follows:

"Section 1. That the salaries of the judges of the Court of Appeals of this Commonwealth shall be $5,000 each per anum.

"Sec. 2. That the provisions of this act shall not apply to the incumbents during the present term of their office.

"Sec. 3. That all laws in conflict with this act are hereby repealed."

Section 235 of the new Constitution reads as follows: "The salaries of public officers shall not be changed during the term for which they were elected. . . ."

It is contended by the Auditor of Public Accounts that, by reason of section 235, the salaries of the judges in office at the time the Constitution was adopted could not be increased. And it is further contended by him that the second section of the act of March 4, 1894, *supra*, excluded them from its operation, and that they could only draw the salary of $4,000, under the act that was in force at the time of their election. With this contention we can not agree; first, because, under the section of the old Constitution quoted (article 4, section 3), the salaries of Judges Pryor and Lewis could have been increased, and second, it is a well-established principle of construction that constitutions have no retroactive effect—that they operate in the future, and not in the past. The appellees, Judges Pryor and Lewis, were permitted by the Constitution to hold their offices during the period for which they were elected. They would become a part of the new court when it was organized January 1, 1895; and they knew that, by the 112th section of the new Constitution, the Legislature had the right to fix their compensation—and can it be doubted, if the Legislature had fixed the compensation of the judges of the Court of Appeals in the act of March 4, 1894, at $3,500, that that is all the salary they could have received after the 1st day of January, 1895? Section 235 of the Constitution, which provides that the salaries of

public officers shall not be changed during the terms for which they were elected can only operate after the Legislature has acted and fixed the compensation.

Judge Hazelrigg took office January 1, 1893, having been elected after the new Constitution was adopted; and can it be contended, by reason or authority, that his salary could not be fixed by an act of the Legislature after he went into office, or that he would not be compelled to accept whatever salary it might fix, under section 112 of the Constitution? But when once fixed, it could not be reduced during his term of office.

The salaries of the appellees, Pryor and Lewis, as we have before stated, could be increased under the old Constitution, and certainly the new Constitution did not take this right away from them; but their salaries were subject to legislation, after the adoption of the new Constitution, and after it was fixed by the act of 1894, *supra*, it can not be reduced during their terms of office.

We have been cited to a number of cases by the learned Attorney-General, but none of them militate against the views herein expressed, except the case of Commonwealth v. Addams, clerk (85 Ky., 588). In section 246 of the Constitution, it is provided that no public officer shall receive more than $5,000 per annum as compensation, except the Governor. In June, 1893, the Legislature passed an act requiring the clerk to report to the Auditor all fees received by him, and, after retaining for himself as salary $4,000, and after paying his assistants or deputies, and all expenses of the office, the balance remaining was to be paid over to the Auditor of the State. A heavy penalty was imposed

on the clerk for failure to comply with the provisions of this act. The clerk contended that, by section 235 of the Constitution, his salary could not be diminished during his term. But in this case the controlling point in the decision was, that, in the debates in the convention that adopted the Constitution (Debates, Con. Con., vol. 3, pp. 4202-3, · 4236), they disclaimed any purpose of interfering with the compensation of the "present incumbent."

In the Dakota cited by the Attorney-General, of Polk v. Minnehaha County (5 Dak., 129), the Legislature of Dakota Territory passed an act, approved March 7, 1883, which provided that the district attorneys should receive such salaries for their services as the board of county commissioners of the proper counties should allow, not less than $400 per year; but the salary of such district attorney should not be diminished during the term for which he should be elected or appointed. It appears from the facts in that case that appellant Polk qualified as district attorney for Minnehaha county on January 3, 1887; and on January 8, 1885, at a regular session of the board of county commissioners, the salary of the district attorney was fixed by the board at $1,200, and that was the salary fixed when Polk was sworn into office. About an hour after he was sworn in, the county commissioners met and reduced the salary to $700, and the court decides in that case that this they could not do, because the salary had been fixed before he was sworn into office and it could not be changed during his term. The court uses this language in that case: "The salary, when fixed or allowed, relates and attaches to the office itself, and also to the individual officer, in so far

as that the person who, for the time being, holds the office is entitled to receive the salary of the office. . . . The board of county commissioners had no power or authority to diminish the salary of the office of district attorney, after the term of office for which the plaintiff (appellant) was elected had begun—that is, during his term. Their action was illegal, and the district court should have so found and declared, and judgment have been rendered accordingly." It will be seen from that case that the salary of the district attorney, under the law, had been fixed before Polk was sworn into office, and it was there decided—and correctly, too, as we think—that it could not be changed after he was sworn in.

The Attorney-General in his brief cites us to the case of Bright v. Stone. This case is now pending on a petition for rehearing, and can not be regarded as authority here. But it is sufficient to say that, by act of the Legislature, approved June 15, 1893, the fees of all the circuit and county clerks, sheriffs, constables and jailers, were fixed, and they were all inducted into office January 1, 1893, before that act was passed.

The Attorney-General also cites us to the case of City of Louisville v. Wilson, 99 Ky. It seems that, on January 9, 1894, the general council of the city of Louisville passed an ordinance fixing the salaries of the officers of the Board of Public Safety and Public Works at $3,000 per annum; that by ordinance approved January 26, 1894, it was provided that there should be one secretary of the Board of Public Works, whose compensation should be fixed at $2,000; and on January 21, 1896, appellee Hoertz

was, by the Board of Public Works, appointed secretary
for the term of four years.  By ordinance approved May
21, 1894, it was provided that the compensation of deputies
of the police court should be $1,500 each, payable monthly.
In January, 1895, appellee J. J. O'Connell was, by one I.
N. Vetter, bailiff of said court, appointed one of his as-
sistants or deputies.  January 9, 1894, by ordinance, the
compensation of official stenographer of said court was
fixed at $1,000.  February 24, 1894, appellee John P. Mar-
tine was, by the judge of. the court, appointed to that of-
fice.  December 26, 1895, the general council, composed of
newly elected members, passed an ordinance, duly approved
by the mayor, changing the salaries of the members of
the boards of Public Safety and Public Works to $2,500;
that of secretary of the board to $1,200; that of deputy to
$1,200; that of official stenographer to $900.  The court
decides in that case that the salaries of these officers having
been fixed by ordinance after they were qualified, could
not be reduced during their terms of office.  While there is
a dissenting opinion in that case by Judges Guffy and Du-
Relle, they agree that the court was right on that proposi-
tion, that is, that the salaries of these officers could not be
reduced during their terms; but they differ with the ma-
jority of the court on the ground that these offices were not
constitutional offices, and the Constitution only meant that
the salaries of public officers recognized by it could not
be changed during their terms.

The case of Purcell v. Parks (82 Ill., 346) cited by ap-
pellees in their brief, sustains the position here announced;
that is, that where the power is given by the Constitution

to fix salaries of public officers, that power remains unexhausted until the Legislature acts, but when once fixed it can not be changed. Under the Constitution of Illinois, the fees, or salary, or compensation of no muncipal officer, elected or appointed, could be increased or diminished during his term. It further provided that county clerks were required to be elected in each county on the first Monday in December, for the term of four years. Section 8 of article 10, of the Constitution provided that as to all county officers who should be in office at the meeting of the General Assembly after the adoption of the Constitution, all laws in force fixing their fees should terminate with their respective terms of office, and that the General Assembly should provide for and regulate the fees of such officers and their successors, so as to reduce the same to a reasonable compensation for services actually rendered. It was also provided by the Constitution that the county board of each county should fix the compensation of all county officers, with the amount of their necessary clerk hire, stationery, fuel and other expenses; and in all cases where fees were provided for, said compensation should be paid only out of, and not in any instance exceeding, the fees actually collected; that they should not allow either of them more than $2,000 per annum, in counties containing twenty thousand and not exceeding thirty thousand inhabitants; "Provided, That the compensation of no officer shall be increased or diminished during his term of office." All fees or allowances by them received, in excess of their said compensation, should be paid into the treasury of the county. By an act of the General Assembly of Illinois, approved

[ 42 ]

March 29, 1872, it regulated the fees of county clerks. In the county of Marion the county board took no action in fixing the compensation of the county clerk of that county until March, 1874. Purcell was elected county clerk of that county at the November election, 1873, for a term of four years from and after the first Monday of December of that year, and on the latter day qualified as such, and entered upon the duties of his office, and charged and received fees, under the act of 1872, providing for and regulating the fees of various officers. At the March term, 1874, during the term of this officer, the county board of Marion county made and entered on record, against the protest of this officer, an order, as follows: "Ordered, that the salary of the county clerk be $1,000 per year, to be in force from the 1st day of December, 1873, as provided by an act of the General Assembly, approved March 29, 1872, and in force July 1, 1872." The action was brought by the treasurer of the county, Parks, to recover of the county clerk all fees he had received in excess of $1,000, which it was agreed was $1,060.61, after deducting necessary expenses.

The court gave judgment for that sum and he appealed. The court in its opinion, says:

"I am instructed by the court to say that, in the opinion of a majority of the judges thereof, the clerk, under the Constitution and statute, is not entitled to appropriate to his own use any of the fees of his office, except by virtue of an order of the county board. In the absence of such order, such clerk has no compensation by law whatever. Hence the fixing of such compensation by the county board, in their order of March, 1874, did not, in the sense of the

Constitution, either increase or diminish the compensation of such officer, for up to that time, he had, by law, no compensation to be increased or diminished. It was the duty of the county board to have fixed the compensation in question before the election. Not having done so, the power remained unexhausted, and the board might have been compelled, either before or after the term began, to exercise the power and fix the same.

We are all of the opinion that when the board had once acted, and fixed the compensation of the county clerk, that compensation can not be changed so as to increase or diminish the compensation to be received by him during his term."

This decision is in line with all the authorities we have been able to find—that is, that the compensation of public officers, after it has been fixed by the Legislature, can not be changed during their terms of office.

By section 112 of the new Constitution, the Legislature provided that the judges of the Court of Appeals should receive for their services an adequate compensation, to be fixed by law; and the Attorney-General admits in his brief that that provision is mandatory. As before stated, the Legislature did fix the compensation, by the act of March 4, 1894, at $5,000. But the contention is, that it does not apply to the judges then in office, by reason of section 2 of said act. We can not agree to this. The Constitution established a new Court of Appeals, beginning January 1, 1895, and we think the second section of the act of 1894 had reference alone to the judges of the old court from the time of the adoption of the act until the organization

of the new court on January 1, 1895. Otherwise, if that provision (section 2) had not been inserted in that act, the judges of the old court would have been entitled to $5,000 from the time of adoption of the act until the new court was organized January 1, 1895; and we think the reasonable construction of that act is, that the salaries of the judges should be equal, and each judge of the new court should draw $5,000 from the organization of the new court on January 1, 1895. And our conclusions are fortified by the 112th section of the Constitution, by the use of the language, "They shall, at stated times, receive for their services an adequate compensation, to be fixed by law."

It was not contemplated by the framers of the Constitution, or the people that adopted it, that old and experienced judges should have a less salary than the new judges to be elected in November, 1894, and who were to form a part of the new court on the 1st day of January, 1895. The spirit and the intent of the people in adopting this new Constitution was equality—equality in salaries, equality in taxation, equality in rights; and it certainly would be unequal and unjust that these old judges, Pryor and Lewis, who had served on the bench for years, should receive a less salary than new judges to be elected, who were without experience in this court of last resort. These views are further fortified by section 133 of the new Constitution, providing that the circuit judges shall receive for their services an adequate compensation to be fixed by law, "which shall be equal and uniform throughout the State." The salary of the circuit judges was fixed at $3,000 before the adoption of the new Constitution, and

the power given by section 133 has never been exercised by the Legislature. They still continue to draw $3,000, and will continue to do so until the Legislature acts.

We conclude that the New Constitution provided for a supreme court called the Court of Appeals of Kentucky; that it was a new court, to go into effect on the 1st day of January, 1895; that the Legislature had the right to fix the compensation of the judges of said court: they did fix it, by the act of March 4, 1894, and it applied to all the judges of that court organized January 1, 1895, and that said judges, including the appellees, are entitled, under that act, to a salary of $5,000 per annum each.

Judgment affirmed.

Special Judge Waddle dissenting and will file dissenting opinion.

SPECIAL JUDGE WADDLE DELIVERED THE FOLLOWING DISSENTING OPINION JUNE 21, 1898:

Considering the circumstances surrounding me in this case, I would deem it an instance of peculiarly good fortune if I could give my assent to the opinion of the majority. Although compelled to dissent, I would much prefer not to render a dissenting opinion, and only do so for fear that my refusal of assent to the majority opinion might be regarded as merely captious, unless accompanied by my reasons therefor.

The issue in this case involves the construction of section 235 of the Constitution of 1891, and of the act of the Legislature of March 6, 1894, but in my judgment a proper construction of the latter will furnish a full solution of this case without reference to the former, although it is

proper as bearing upon the question to ascertain the intent and purpose sought to be attained by the constitutional provision above referred to.

In construing this provision of the Constitution and of the legislative act involved, the purpose should be to ascertain the intent of the framers of the Constitution and the people who adopted it, and the intent of the Legislature that enacted into a law the act of March 6, 1894.

The object of construction as applied to a constitutional provision is to give effect to the intent of the people adopting it. In arriving at this intent, we should look to the history of the times and examine the state of things existing when the Constitution was framed and adopted. And it is competent for us to look at contemporary interpretation, and to examine the debates of the convention framing the Constitution. Though these by no means will be taken as an exclusive guide, they will serve in arriving at a proper conclusion.

In construing a legislative enactment, it is the intent of the Legislature that should be sought and enforced.

With these obvious rules of construction to guide me, I shall present a few reason why I refuse assent to the majority opinion, and will try to show that an exactly opposite conclusion should have been reached.

The Constitution of 1850, which was supplanted by the Constitution of 1891, provided for one supreme judicial tribunal, consisting of four judges, to be styled the Court of Appeals. Each of the two preceding Constitutions contained the same provision, and our Court of Appeals

was continued in uninterrupted operation from the organization of the State down to the adoption of the Constitution in 1891, each succeeding Constitution continuing the judges then in office and the machinery necessary to carry on its functions uninterruptedly.

The framers of the Constitution of 1891 continued this same court, its judges, its clerk and all machinery in full and uninterrupted operation, providing in order to meet the exigencies of increased business that after 1894 the court should consist of not less than five, nor more than seven judges, instead of four, and further providing that the General Assembly should, before the regular election in 1894, re-divide the State into districts, and provide for the election of not less than five nor more than seven judges. The Constitution did not authorized the Legislature to create or establish a new Court of Appeals, but to reorganize and provide additional judges for the Court of Appeals created and established by it. The Constitution invested the Legislature with no creative power in the establishment of courts, for section 109 specifically provides that no courts shall exist in the State, except those established by that instrument.

While the Constitution enjoined the Legislature to carry out its provisions above-mentioned, there was no way provided to force the Legislature to comply with this constitutional mandate, and if the Legislature had failed to act, we would continue to have the same Court of Appeals, composed of four judges, performing the duties of that court in uninterrupted operation. This position is

substantiated by section 115 of the Constitution, which provides:

"The present judges of the Court of Appeals shall hold their offices until their respective terms expire, and until their several successors shall be qualified; and at the regular election next preceding the expiration of the term of each of the present judges, his successor shall be elected."

As the framers of the Constitution of 1891 used the same language and the same words in providing for a Court of Appeals as were used in the Constitution of 1850, it was not the purpose to change the organic law in this particular, but to continue the same court · in uninterrupted operation, empowering the Legislature to make such changes in the number of judges as the exigencies of litigation might require. My position on this point is sustained by Mr. Cooley in his work on Constitutional Limitations, page 75, in which he says:

"If the new instrument re-enacts in the same words provisions which it supersedes, it is a reasonable presumption that the purpose was not to change the law in those particulars, but to continue it in uninterrupted operation."

Mr. Cooley further holds this rule of construction to be unquestionable.

But if I am mistaken in this position, and a new court has been created under the Constitution of 1891, this creation took place upon the adoption of that instrument, September 28, 1891, by virtue of constitutional enactment, and not on January 1, 1895, by the Legislative act of 1893, as contended by the majority. Every provision of the Constitution took effect upon its adoption, and the provi-

sions referring to the compensation of the judges of this court, and the restrictions against the decrease or increase of official salaries applies to them, as well as other officers from the moment the Constitution was adopted; and I especially dissent from the intimation of the majority opinion that the Constitution of 1850 remained in force authorizing the Legislature to increase the salaries up to the passage of the act of March 6, 1894, while it was restricted by both the Constitution of 1850, and 1891 from decreasing such salaries.

Looking at the history of the times, to ascertain the purposes of the framers of the Constitution of 1891, we find that the Constitution of 1850, while denying the right of the Legislature to diminish the compensation fixed by law for our State officials during their terms of office, the Legislature was conceded the power to increase their salaries to any extent it saw proper. This court, in construing this provision of the Constitution of 1850, has properly held that the reason for its adoption was to protect the officials in the emoluments they expected to receive when elected, of which they might be deprived as the result of prejudice or false economy. During the life of the Constitution of 1850, which prohibited the decrease, but allowed the increase, of official compensation, we were afflicted with a national scandal by the Congress of the United States passing a law, which increased the salaries of its members during the term they were then serving, which enabled them to pocket the money of the people to which they were not justly entitled. In addition to this, various instances arose in the increase, and at-

tempts to increase, of official compensation, sapping the integrity of our official life. Combinations of officials and their representatives infested the lobby of every legis-lative hall, until their persistency and methods had be-come a stench in the nostrils of the people. Under these circumstances, it seems to me that the purpose of the framers of the Constitution was, that, while throwing a safeguard around the official, after his induction into office, and protecting him in the emoluments he expected to receive, of which he might be deprived as the result the prejudice or false economy, they desired to protect the people against increased official compensation, often pro-cured by undue influence and through the channels of cor-ruption. This purpose is shown by the debates of the Constitutional Convention. We further find from the de-bates of the convention, that the framers of the Constitu-tion regarded that, when a citizen was elected to an office to which there was a salary attached, fixed by law, he was to be regarded as having entered into a *quasi* contract with the people to serve for the compensation he expected to receive, and by this means not only secure the officer and protect the people, but to secure the integrity of official life. Such restrictive provisions are just alike to the officials and the people, and if, peradventure, any offi-cer should find his duties too arduous for the salary he received, there is no law to prevent him from resigning the burden, which will be anxiously assumed by another.

By the legislative enactment in 1880, the salaries of the judges of the Court of Appeals were fixed at four thousand dollars each per annum, payable monthly. This

act not being inconsistent with the Constitution of 1891, remained in full force by virtue of section 1 of the schedule of that instrument until altered or repealed by the Legislature. The four thousand dollar salary therefore attached to the office both before and after the adoption of the Constitution of 1891, and did not cease on the adoption of that instrument, but remained as a salary fixed by law until altered or repealed. This construction was adopted by the executive department of the State in continuing to pay that salary, and by the judges themselves in receiving it.

By an examination of the proceedings of the Constitutional Convention, it will be seen that the committee on the Court of Appeals, in its report to the convention, fixed the salary of these judges at four thousand dollars, thus making that sum fixed and unchangeable as the compensation they were to receive. Judge De Haven, a member of the convention and a man of recognized legal ability, and a judge of eminence and long experience, asked that this provision be stricken out, because, he said (evidently referring to the act of 1880), the salary was then fixed by law at four thousand dollars, and there was no necessity of putting the same amount in the Constitution. He further said: "In the course of time, it may be necessary to enlarge or decrease the compensation of the appellate judges, and I think it wholly unnecessary to have those words in." He certainly thought that, not immediately, but at some future time, under changed conditions to justify it, their salaries ought to be increased. But we find that within less than three years from the adoption of

the Constitution, their salary is increased from four
thousand to five thousand dollars, the constitutional
limit; and this, too, without any change in conditions,
except such as might have justified a decrease, and not an
increase, in salary.

These conditions were, that money was increasing in
value and in its purchasing power, and the work of four
men formerly had been transferred to the shoulders of
seven, thus lessening, it is to be presumed, individual
responsibility and labor. The change in the salary and
its increase to the constitutional limit could not, under
the opinion of the majority, be reduced as to any one of
the judges, at least for eight years, the longest time any
of them had to serve. Under these circumstances, if the
construction given by the majority to the act of March 6,
1894, is correct, a suspicion is raised that that act is
violative of the will and intent of the people who adopted
the Constitution. We, therefore, find that at the time of
the adoption of the Constitution in 1891, we had a Court
of Appeals consisting of four judges, who were continued
in office for the terms for which they had been respectively
elected, under the Constitution of 1850, with a salary to
each, fixed by law, at four thousand dollars per annum,
and who continued to exercise the duties of the office and
draw that salary uninterruptedly.

This brings us to the passage of the act of March 6, 1894,
changing the salary from four thousand dollars to five
thousand dollars per annum. Before this act, and in June,
1893, the Legislature had redistricted the State, as di-

rected by the Constitution, and provided for the election of three additional judges, or seven in all.

At the time of the passage of the act of March 6, 1894, appellee Pryor was an incumbent, having been elected in 1888, for the term of eight years, his term, therefore, ending on the first Monday in January, 1897.

Appellee Lewis was likewise an incumbent, having been elected in 1890 for eight years, his term ending first Monday in January, 1899.

The Constitution (section 115) provides that: "The present judges of the Court of Appeals shall hold their offices until their respective terms expire, and until their several successors shall be qualified." These two appellees had a continuous, unbroken term from a time anterior to the passage of the act of March 6, 1894, and posterior to January 1, 1895.

Appellee Hazelrigg was elected under the Constitution of 1891, at the November election in 1892, his term, by the express provisions of the Constitution, beginning on the first Monday in January, 1893, and extending for the period of eight years, ending January, 1901.

This status of the appellees is not only fixed by the agreed facts, but by the provisions of the Constitution. Sustaining this official status, the General Assembly, by act of March 6, 1894, changed the salaries of the judges of the Court of Appeals from four thousand dollars to five thousand dollars per annum, and provided in the second section of that act as follows: "That the provisions of this act shall not apply to the incumbents during the present term of their offices." The incumbents were the

appellees, and their respective terms of office extended
from their qualification to the end of the term, for which
they were elected, and until their successors qualified.

In the face of this plain status of the appellees, the
majority opinion holds that their term of office was split
in two, that they held one term up to January 1, 1895, and
a new and another term from that time until they go out
of office, and that, therefore, when the Legislature pro-
vided in the act of March 6, 1894, "That the provisions of
this act shall not apply to the incumbents during the
present term of their offices," it meant that it should not
apply to the incumbents from that time until January 1,
1895, when they say their old, or present term, ceased,
and a new term began.

What provision of the Constitution, or what law is it,
that splits the term in two, for which these men where
elected, and gives them two terms of office instead of one?
If the legislative intent is to be found in the construction
given by the majority of this provision of the act, then
why did not the Legislature simply enact that, "on and
after January 1, 1895, the salaries of the judges of the
Court of Appeals shall be five thousand dollars per an-
num?" Why resort to such jugglery of language, such
circumlocution, to reach an object so simply and easily
attainable?

It seems to me that there can be no doubt but that the
Legislature intended to exclude the appellees, who were
then the incumbents, from the provisions of that act for
the entire terms for which they had been elected. This
was doing them no injustice, for it left them receiving

the salary they expected to receive when elected, and was but carrying out the spirit and intent of the Constitution, which prohibited any change in salary during the terms for which they were elected.

I am unable to see by what process of reasoning the construction of the majority can be made to apply to appellee Hazelrigg. He was elected under the new Constitution for the term of eight years, and by no stretch of the imagination can it be said that his present term ended January 1, 1895, and began again on that date.

I recognize that, to adhere to my views, will give an unequal salary,—at least, for a time,—to officers supposed to perform the same duties. But that is exactly what the framers of the Constitution knew, and what they contemplated when they prohibited any change in salaries during the term of office. They proceeded upon the principle, as I have before stated, that when a man sought, and was elected to an office, with a salary attached thereto, he knew exactly what he would receive, and what the people expected to pay, that a *quasi* contract arose between him and the people, and that he should not be permitted to receive more, and they guaranteed he would get no less. The framers of the Constitution knew that, under the provisions requiring the alternate election of the judges of the Court of Appeals biennially, the salary of none of them could be changed, except at the end of about eight years, if equal compensation was adhered to; and it is to be presumed they did not propose to tie the people up for this long period of time, but to secure the payment of the amount contracted to each official, and

thus proceed upon a sound basis, and upon business principles, with the public business.

The act of March 6, 1894, meant that the judges thereafter elected should receive five thousand dollars each per annum, leaving the incumbents excluded by section 2 to continue to receive the four thousand dollars per annum, which was fixed by law as their salary when they were elected.    This is the contemporary construction placed upon it by the compilers of the Kentucky Statutes.   This compilation was completed in August, 1894, and within sixty days after that act took effect.   The compilers of these statutes, looking at the act of 1880, and the act of March 6, 1894, and bringing the two together, and expressing the whole law in a short, clear and concise form, say under the titles of "Salaries" (section 4357 Kentucky Statutes, sub-section 11) "Judges of the Court of Appeals four thousand dollars each per annum.   Judges hereafter elected, five thousand dollars."

The compilers of these statutes were Hons. Joseph Barbour and John D. Carroll.    Mr. Barbour (now deceased) was the author of Barbour's Digest of the opinions of this court, a work universally recognized in the State, and used by the profession and by the courts.   For years, he was a member of the Superior Court, a court of appeals second only to this tribunal, and he continued a member of that court from its creation until it was abolished in 1894.   As a judge of that court, he was continually on the bench, in the capital of the State, where the Constitutional Convention and the session of the Legislature of 1894 were held.   Mingling with the members of

these bodies, and being directly interested in their deliber-
ations, he certainly had an extraordinary chance to under-
stand the purposes and intent of these bodies.

Mr. Carroll is the author of Carroll's Kentucky Codes of
Practice, and is a man of recognized legal attainments.

These men, engaged at the time of the passage of the
act of 1894 in compiling the Kentucky Statutes, gave it
the construction above quoted. The Kentucky Statutes,
since their compilation, have been in constant use by the
courts, and are daily cited as authority, and are cited in
the majority opinion; yet their compilation on this one
question is ignored, the original act resorted to, and the
point decided upon a theory of construction that does not
impress me as arising to the dignity of a respectable tech-
nicality. The construction of these eminent compilers of
our statute laws, while not conclusive, should have great
weight in determining the intention of these legislative
bodies; and in arriving at their intent, I should prefer to
follow them, rather than the tortuous channels and
devious paths of legal technicalities.

If, however, it was the intention of the framers of the
Constitution to provide equality in salaries when they
said, "The judges of the Court of Appeals shall receive an
adequate compensation to be fixed by law," the act of
March 6, 1894, is unconstitutional in whole or part, and it
should be so declared. Strike out the second section, if
you can, and let the five thousand dollar salary remain, or
hold the whole act unconstitutional, and leave the salary
at four thousand dollars, and in either case attain equality

[43]

in salary, as enjoined by the Constitution as construed by the majority opinion.

If I thought the Constitution enjoined equality in. salary, as held by the majority, I should hold the act of March 6, 1894, unconstitutional. Not the second section only, leaving the first to stand, as contended by the learned counsel of appellees, but the entire act, under the view that it being essential to its validity that it should be uniform in its application, and the Legislature having expressly declared in section 2 that it should not apply to a certain class, the whole act would be invalid, because stripped of section 2, the remainder, though complete in itself, would not express the legislative will. This view is borne out by the following authorities:

Sprague v. Thompson, 113 U. S., 94.

Mesheimer v. State, 2 Ind., 482.

State ex rel. v. Supervisors, 62 Wis., 379.

Kelly v. State, 6 Ohio St., 269.

Sutherland on Statutory Constructions, secs. 178-9.

The injustice of inequality of salaries would not be so apparent as contended by the majority, if the four thousand dollar salary had been lowered, instead of raised, and I disagree with the majority in holding that if the salary of the judges then in office had been diminished, they would have been compelled to receive it. They had a salary fixed by law of four thousand dollars when they were elected, which the Constitution of 1850 said should not be diminished, and the Constitution of 1891 declared should not be changed during their term of office. And instead of section 133 of the Constitution, relating to the

salaries of circuit judges, fortifying the position of the majority, as contended, it seems to me to overturn it and sustain the views I entertain.

This section, it will be observed, uses the same language as to the salaries of the circuit judges as section 112 does as to the salaries of the judges of the Court of Appeals, but goes further and says: "Which shall be equal and uniform throughout the State." If the phrase, "an adequate compensation to be fixed by law," means an equal and uniform compensation in section 112, why should it not mean the same thing in section 133, and if it did, why the necessity of going further and providing that this adequate compensation should be equal and uniform throughout the State? To hold that the word "adequate" means equal and uniform in section 112 of the Constitution, and does not mean the same thing in section 133, we will have to presume that the framers of that instrument used the same language in different sections in reference to the same subject with different meanings. The presumption of the law is, that the same language in different parts of an instrument means the same thing. The salaries of the circuit judges were fixed by law at the time of the adoption of the Constitution at three thousand dollars per annum, in the same way as the salaries of the judges of the Court of Appeals were fixed by law at four thousand dollars. They continued thereafter to be entitled to, and have ever since that time been paid, a salary of three thousand dollars. These judges were elected under the new Constitution in 1892, and they, or their successors, were elected in 1897, with the old salary of three thous-

and dollars attaching to their office and fixed by law. I doubt not that each of them, relying upon section 235 of the Constitution, expected that no change could be made in their compensation during their term, and I deny the right of the Legislature to violate not only the letter, but the spirit of the Constitution, and change the salary of these judges, as it is held it can do by the majority. There is no reason why the salary of these circuit judges should not be equal and uniform, because they are all elected at the same time, and for the same term; but if they were elected alternately, as the judges of the Court of Appeals, the reason why the framers of the Constitution would not enjoin equality of salary would become apparent.

This case is not, as contended by the learned counsel of appellees, a case entirely of first impression and *sui generis*. The same constitutional provisions and statutes of the same character as are involved in this case have been considered by this court and construed. Cases involving the same principle as this have been considered and decided by this court, and the opinion in those cases stand, as I think, in direct antagonism to the opinion of the majority in this case. And especially is this true of the case of Commonwealth .v. Addams, 95 Ky., 568. Mr. Addams, the appellee in that case, was elected to the office of clerk of the Court of Appeals, prior to the adoption of the Constitution of 1891, and was in the enjoyment of the emoluments of his office at that time. He was allowed as compensation for his services not a salary, but certain fees prescribed by law. The Constitution (section 120) provides: "The present Clerk of the Court

of Appeals, shall serve until the expiration of the term, for which he was elected, and until his successor is elected and qualified." His term will expire first Monday in September, 1898.

Section 246 of the Constitution provides: "No public officer, except the Governor, shall receive more than five thousand dollars per annum as compensation for official services, independent of legally authorized deputies and assistants, which shall be fixed and provided by law."

It is a well known fact that the compensation of the clerk, under the old law, and the fee system, largely exceeds five thousand dollars per annum. In June, 1893, the Legislature passed an act requiring the clerk to report to the auditor all fees received by him, and after retaining for himself as a salary, four thousand dollars per annum, and paying his deputies and office expenses, the balance to be paid to the auditor of the State and covered into the treasury. He refused to comply with the act of 1893, claiming that it changed his compensation during his term of office, and invoked the provisions of sections 161 and 235 of the Constitution, as preventing the application of the act of 1893 to him.

In passing upon that case and discussing the provisions of sections 161 and 235 this court said: "So, by these express provisions of the organic law, it was evidently intended to prevent any interference with the salary or compensation of a public officer during his term of office." And the court held that, while the office of clerk of the Court of Appeals is not expressly mentioned, it is an office recognized by

the Constitution, and that so far as the compensation is
concerned fell within the spirit and meaning of the pro-
visions of the Constitution preventing legislative interfer-
ence with the compensation during the term of office. So
we find an officer elected prior to the present Constitution,
and his term of office continued until the expiration of
the time for which he was elected, just as two of the
appellees were; and yet, although the Legislature passed
an act in pursuance to the mandate of the Constitution
which would result in a reduction of his compensation,
without any attempt to exempt him from the provisions
of the act, as in the case of the judges, the court holds
that under the spirit and meaning of these constitutional
provisions preventing legislative interference with official
compensation during the term of office, the Legislature
had no power to change the compensation fixed by law
at the time of the adoption of the Constitution, attaching
as it did to the offices and officers continued by its provis-
ions. No reason can be advanced for the application of
the provisions to the present clerk of this court, that
does not apply ten fold to the judges who were in, and
who now continue in office by the new Constitution,
just as he was. I think the majority has misconceived
the opinion in that case in holding that the court was
controlled by the debates of the Constitutional Conven-
tion.

The debates of the Convention are not law, and cer-
tainly this court, nor the distinguished judge who ren-
dered the opinion, intended to so hold. In that case this
court held, that the compensation of the clerk could not

be changed, and, applying the same construction in this case, we would be compelled to hold, under the same provisions of the Constitution, that the salaries of the judges could not be changed. The Addams case was the first and leading case of construction of these new provisions, for the first time introduced into our organic law. It is published in the books as authoritative, and is the beginning corner of this new field of investigation; and I insist that if the opinion of the majority is to stand as the law, the Addams case should be overruled.

In the case of the City of Louisville v. Willson, (99 Ky., 603), in which the same principles of constitutional construction were involved, this court said: "The purpose of section 161 was to prevent as well the reduction of compensation of officers, sometimes the result of prejudice and false economy, an increase of it, sometimes brought about by importunity and undue influence on their part; and so there can not be any change at all of an officer's compensation during his term; but there is an essential difference, which we are satisfied the framers of the Constitution had in mind between fixing the amount of compensation an officer shall receive, not hitherto ascertained and settled, and changing it after it has been fixed."

The court further says:

"It is the obvious and uniform policy of government, State and municipal, as well as just to each officer, to fix his compensation definitely and certainly as to amount, except when he is paid by fees of office. And section 161 does not, in terms, nor was intended to forbid, or at all relate to any statute or ordinance that, for the first

time, does fix the salary of an officer, but it is equally necessary for the protection of both the government and officer that his salary when once fixed should not be changed during his term, and for no other purpose than to prevent that evil was section 161 made a part of the Constitution."

As I have above shown, the case at bar does not involve the amount of compensation an officer shall receive, not hitherto ascertained and fixed; but the compensation of appellees was fixed and settled by the act of 1880, continued in force by the Constitution, and therefore a fixed and settled salary to the office of judge of the Court of Appeals was fixed, and so recognized and received by the appellees, which, even eliminating section 2 of the act of March 6, 1894, was attempted to be changed in violation not only of the express provisions of the Constitution, but its spirit and intent. If, instead of increasing the salary from four thousand to five thousand dollars the act of March 6, 1894, had decreased it to three thousand in violation of the provisions of the old, as well as the new Constitution, the injustice to the appellees would be apparent; and I hold it was the clear intent of the framers of the Constitution to confer no such power on the Legislature; and if the Legislature had no power to decrease, it certainly had none to increase their salary.

The vice of the majority opinion, it seems to me, is in assuming that there was no salary attached to the office of a judge of the Court of Appeals, and none fixed by law after the adoption of the Constitution in 1891 to the passage of the act in 1894, when nothing seems to me clearer

than that the four thousand dollars salary attached to the office, and became fixed by law upon the adoption of the Constitution, as certainly as if that instrument had expressly so provided.     I hold that the four thousand dollar salary attached to the office of the judges of the Court of Appeals , upon the adoption of the Constitution in 1891, and was, therefore, fixed by law.   .

This salary attached to the office at the time appellee Hazelrigg was elected under the new Constitution in 1892, and, therefore, each of the appellees had a salary fixed by law, which they were receiving at the time of the passage of the act of March 6, 1894; and it was not within the power of the Legislature to change that salary, either to to increase or diminish it, under the provisions of the Constitution prohibiting such a change during the term of office.

The case of Purcell v. Parks (82 Ill., 346), cited and discussed in the majority opinion, in no way militates against my position.   There is a distinguishing feature in that case from the one at bar, clearly shown in the quotation from it in the majority opinion, which not only destroys it as a fortification of the contention of the majority, but sustains the view I hold.   The Constitution of Illinois provided that, as to all county officers who should be in office at the meeting of the General Assembly after the adoption of the Constitution, all laws in force fixing their fees should terminate with their respective terms of office, and that the General Assembly should provide for and regulate the fees of such officers and their successors, so as to reduce the same to a reasonable compensation for services actually rendered.

If our new Constitution had repealed the law of 1880, fixing the judge's salaries at four thousand dollars, or had fixed a time when it should no longer be in force, and enjoined upon the Legislature to then ·fix their salaries, as in the Illinois case, there would be no room for contention; but instead of so doing, it expressly continued the act of 1880 in full force.

The provision of the Constitution of Illinois discussed in that case is mandatory, while the provisions of the Constitution of this State as to the fixing of the salaries of the judges of the courts are not mandatory. If the Legislature had never passed any act in reference to their salaries, the judges of the Court of Appeals would still be entitled to the four thousand dollar salary, as fixed by the law of 1880, and they would continue to receive that salary indefinitely, and until the Legislature acted. The Constitution leaves their salaries as then fixed by law to continue until the Legislature saw fit to change them, but in making such change it must regard the limitations of the Constitution prohibiting the change during the term of office.

In the Illinois case the court says, in the citation in the majority opinion: "In the absence of such order (the order fixing the salary), such clerk has no compensation by law, whatever. Hence, the fixing of such compensation by the county board in their order of March, 1874, did not, in the sense of the Constitution, either increase or diminish the compensation ef such officer, for up to that time he had, by law, no compensation to be increased or diminished." If there had been a ·compensa-

tion allowed by law, it is evident the decision in that case would have been different. It is admitted by the majority that appellees did have a compensation fixed by the law of 1880, at four thousand dollars, up to the passage of the act of March 6, 1894, and the contention that the act of 1894, leaving out section 2, did not increase, but fix, the salary, has no real existence.

In every case in the books where similar constitutional provisions have been invoked, they have been held to be applicable, except in such cases, where there was no salary attached to the office, and no compensation allowed by law at the time the salary was fixed.

But whatever may be the correct construction of these constitutional provisions, the act of March 6, 1894, excludes appellees from its provisions for the entire term for which they were elected. It was the intention of the Legislature that they should be so excluded, and in my opinion they are only entitled to receive as their salary, four thousand dollars each per annum. If it be true that the Constitution enjoins uniformity of salary to these judges, the act of 1894 should be declared unconstitutional and void, and all the judges remitted to the salary of four thousand dollars; but I do not think any such injunction was laid.

My conclusions, therefore, are:

First. That the framers of the Constitution, in the adoption of sections 161 and 235, intended to prevent a change of salary during the term of office, and that these provisions were intended to, and should be made to apply to all persons in office at the time of the adoption of the

Stone, Auditor, v. Pryor, etc.

Constitution, and who were continued in office by the terms of that instrument, as well as to those who might be thereafter elected, for it appears and is shown by the debates of the Convention that it was the purpose of the framers of the Constitution to protect all officials in their tenure of office, and in the emoluments they were entitled to receive.

Second.—That when the Legislature provided in the act of March 6, 1894, that that act should not apply to the incumbents, it meant exactly what it said, and said exactly what it meant; and as each of these appellees were incumbents, at the time of the adoption of that act, that they are therefore excluded from the benefit of its provisions.

I wish to say, however, that with the short experience I have had, and becoming acquainted as I have with the labor of these officials, I do not believe five thousand dollars per annum a single cent beyond what they should receive by law. If I was a member of a Legislature, before whom the question of their compensation should be raised, I would advocate no less sum; but I am passing upon the law as I find it written, and I am unable to come to any other conclusion than as herein expressed.

I am sensible of the fact that the rule of construction laid down in the majority opinion will doubtless become the established doctrine, although I hardly see how it is to become a precedent until the Addams case is overruled. It may be that my views will be like throwing chaff to the wind, but I submit them in the hope that they may at least conduce at some time in the future to produce uniformity of constitutional and statutory construction.