Ernie FLETCHER, in His Official Capacity as Governor of Kentucky; and Robbie Rudolph, in His Official Capacity as Secretary of the Finance and Administration Cabinet, Appellants,

v.

COMMONWEALTH of Kentucky, Office of the Attorney General ex rel. Gregory D. Stumbo; Common Cause of Kentucky, a Non–Profit, Non–Partisan Organization, by Its Chairman Richard V. Beliles, as a Kentucky Taxpayer; Steve Nunn, Representative; Jim Wayne, Representative; Harry Moberly, Jr., in His Official Capacity as Member of the House of Representatives of the Commonwealth of Kentucky; Joe Barrows, in His Official Capacity as Member of the House of Representatives of the Commonwealth of Kentucky; Jim Callahan, in His Official Capacity as Member of the House of Representatives of the Commonwealth of Kentucky; David L. Williams, in His Capacity as President of the Senate of the Commonwealth of Kentucky; Jody Richards, in His Capacity as Speaker of the House of Representatives of the Commonwealth of Kentucky; Kentucky Retirement Systems, Board of Trustees; and Commonwealth of Kentucky, Department of the Treasury ex rel. Jonathan Miller, Appellees,

and

Steve Nunn; and Jim Wayne, Appellants,

v.

Commonwealth Of Kentucky ex rel. Governor Ernie Fletcher; Robbie Rudolph, Commonwealth of Kentucky, Secretary of Finance & Administration; Gregory D. Stumbo, Commonwealth of Kentucky, Attorney General; Jonathan Miller, Commonwealth of Kentucky, State Treasurer; David Williams, Commonwealth of Kentucky, Senate President; Jody Richards, Commonwealth of Kentucky, House Speaker; Common Cause of Kentucky and Richard Beliles; Kentucky Employees Retirement Systems, Board of Trustees; Harry Moberly, Representative, in His Official Capacity; Jim Callahan, Representative, in His Official Capacity; and Joe Barrows, Representative, in His Official Capacity, Appellees,

and

Commonwealth Of Kentucky, Department of the Treasury, Acting Through the Treasurer of the Commonwealth, Jonathan Miller, Appellant,

v.

Commonwealth of Kentucky, Office of Attorney General Ex rel. Gregory D. Stumbo; Commonwealth of Kentucky, Office of the Governor ex rel. Ernie Fletcher; Commonwealth of Kentucky, Finance and Administration Cabinet ex rel. Robbie Rudolph; David Williams, in His Official Capacity as President of the Senate; Jody Richards, in His Official Capacity as Speaker of the House of Representatives; Steve Nunn, Representative; Jim Wayne, Representative; Common Cause of Kentucky and Richard Beliles; Kentucky Retirement Systems, Board of Trustees; Harry Moberly, Representative; Jim Callahan, Representative; and Joe Barrows, Representative, Appellees.

No. 2005–SC–0046–TG, 2005–SC–0049–TG, 2005–SC–0050–TG.

Supreme Court of Kentucky.

May 19, 2005.

John C. Roach, Office of the Governor, Frankfort, M. Holliday Hopkins, Sheryl G. Snyder, David Seth Kaplan, Jason Patrick Renzelmann, Frost, Brown, Todd, LLC, Louisville, Counsel for Appellants Ernie Fletcher, in His Official Capacity as Governor of Kentucky; and Robbie Rudolph, in His Official Capacity as Secretary of the Finance and Administration Cabinet (2005–SC–0046–TG); and for Appellees Commonwealth of Kentucky ex rel. Governor Ernie Fletcher; and Robbie Rudolph, Commonwealth of Kentucky, Secretary of Finance & Administration (2005–SC–0049–TG and 2005–SC–0050–TG).

Walter A. Baker, Glasgow, Phillip J. Shepherd, Frankfort, Counsel for Appellants Steve Nunn; and Jim Wayne (2005–SC–0049–TG).

David J. Hale, Courtney L. Rice, Reed, Weitkamp, Schell & Vice, Louisville, Counsel for Appellant Commonwealth of Kentucky, Department of the Treasury, Acting Through the Treasurer of the Commonwealth, Jonathan Miller (2005–SC–0050–TG).

C. David Johnstone, Office of the Attorney General, Robert S. Jones, Assistant Attorney General, Office of the Attorney General, Pierce Butler Whites, Assistant Deputy Attorney General, Janet M. Graham, Assistant Attorney General, Office of Attorney General, Criminal Appellate Division, Frankfort, Counsel for Appellee Commonwealth of Kentucky, Office of the Attorney General ex rel. Gregory D. Stumbo (2005–SC–0046–TG, 2005–SC–0049–TG and 2005–SC–0050–TG).

Richard V. Beliles, Prospect, Counsel for Appellee Common Cause of Kentucky, A Non–Profit, Non–Partisan Organization, by Its Chairman Richard V. Beliles, as a Kentucky Taxpayer (2005–SC–0046–TG, 2005–SC–0049–TG and 2005–SC–0050–TG).

Walter A. Baker, Glasgow, Phillip J. Shepherd, Frankfort, Counsel for Appellees Steve Nunn, Representative; and Jim Wayne, Representative (2005–SC–0046–TG and 2005–SC–0050–TG).

Donald P. Cetrulo, Lexington Financial Center, Lexington, Timothy Firkins, Assistant Attorney General, John S. Gillig, Frankfort, Counsel for Appellees Harry Moberly, Jr.; Joe Barrows; and Jim Callahan, in Their Official Capacities as Members of the House of Representatives of the Commonwealth of Kentucky; and Jody Richards, in His Capacity as Speaker of the House of Representatives of the Commonwealth of Kentucky (2005–SC–0046–

TG, 2005–SC–0049–TG and 2005–SC–0050–TG).

Harland C. Hatter, Frankfort, Paul Emmanuel Salamanca, Lexington, Counsel for Appellee David L. Williams, in His Capacity as President of the Senate of the Commonwealth of Kentucky (2005–SC–0046–TG, 2005–SC–0049–TG and 2005–SC–0050–TG).

Lizabeth Ann Tully, James D. Allen, Stoll, Keenon & Park, LLP, Lexington, J. Eric Wampler, Kentucky Retirement Systems, Perimeter Park West, Frankfort, Counsel for Appellee Kentucky Retirement Systems, Board of Trustees (2005–SC–0046–TG, 2005–SC–0049–TG and 2005–SC–0050–TG).

David J. Hale, Ridley M. Sandidge, Jr., Reed, Weitkamp, Schell & Vice, Louisville, Counsel for Appellee Commonwealth of Kentucky, Department of the Treasury ex rel. Jonathan Miller (2005–SC–0046–TG and 2005–SC–0049–TG).

Opinion of the Court by Justice COOPER.

The issue presented by this appeal is whether the Governor of the Commonwealth of Kentucky may order money drawn from the state treasury to fund the operations of the executive department of government if the General Assembly fails to appropriate funds for that purpose. The issue arose when the General Assembly adjourned *sine die* on April 14, 2004, without adopting an executive department budget bill for the 2004–06 biennium.

Unlike some state constitutions, *e.g.*, Cal. Const. art. IV, § 12(c), the Constitution of Kentucky does not require a state "budget." It does, however, require that any such budget be balanced. That constitutional requirement derives from Sections 49, 50, and 171, which together authorize and require the General Assembly to raise revenues sufficient to pay the debts and expenses of government. *See generally Dalton v. State Prop. & Bldg. Comm'n,* 304 S.W.2d 342, 347–51 (Ky.1957); *State Budget Comm'n v. Lebus,* 244 Ky. 700, 51 S.W.2d 965 (1932). The first statutory provisions describing a budgeting process were enacted in 1918 and compiled at KS § 1992, *et seq.* 1918 Ky. Acts, ch. 12. The present version, KRS Chapter 48, is a comprehensive scheme that describes the process for preparing and enacting a "budget bill" by which the revenues of the Commonwealth are appropriated for the operation of the three departments of government during the ensuing biennium. KRS 48.300(1). All provisions of a budget bill expire at the conclusion of the second fiscal year of the biennium. KRS 48.310(1). If a budget bill is enacted at an extraordinary session, Ky. Const. § 80, its provisions expire on "July 1 of the year in which the next even-numbered year regular session takes place." KRS 48.310(1).

Prior to 2001, the General Assembly met in regular legislative session only for sixty legislative days in even-numbered years. Ky. Const. §§ 36 (unamended), 42 (unamended). Necessarily, the budget bill for the next biennium was enacted during those sessions. Sections 36 and 42 were amended in 2000 to add an additional regular session of thirty legislative days in odd-numbered years. *Id.* (as amended). However, because all existing budget bills expire on July 1 of even-numbered years, the General Assembly has continued to address budget issues during the sixty-day even-numbered-year sessions. On three occasions within a ten-year period, the General Assembly adjourned its sixty-day regular session without enacting an executive department budget bill for the next biennium. On the first occasion, 1994, Governor Jones reconvened the General Assembly into an extraordinary session, during which the members resolved their

differences and enacted a budget bill for the 1994–96 biennium.

At the 2002 regular session, the Republican-controlled Senate and the Democratic-controlled House of Representatives deadlocked on whether to appropriate funds for the election campaign fund created by the Public Financing Campaign Act, KRS 121A.020, and adjourned *sine die* on April 15, 2002, without enacting a budget bill for either the executive or judicial departments for the 2002–04 biennium. On April 17, Governor Patton reconvened the General Assembly into an extraordinary session for the sole purpose of negotiating a budget bill. Recalcitrance prevailed, however, and the General Assembly adjourned the special session on May 1, 2002, without enacting a budget bill for either of the other two departments of government.

On June 26, Governor Patton promulgated an "Executive Spending Plan" and authorized the Secretary of the Finance and Administration Cabinet to issue warrants against the treasury to implement that plan "and to assist the Court of Justice as may be necessary to implement lawful expenditures for its operation." Exec. Order No.2002–727, para. 6, at 4.[1] In essence, the Governor adopted his own executive department budget and ordered appropriations from the state treasury to fund it. The Treasurer filed a petition in the Franklin Circuit Court for a declaration of rights, KRS 418.040, to determine the constitutionality of the Executive Spending Plan. *Ky. Dept. of the Treasury ex rel. Miller v. Ky. Fin. and Admin. Cabinet*, No. 02–CI–00855 (Franklin Circuit Court, filed June 26, 2002). However, the legislative deadlock dissolved when all potential gubernatorial candidates announced their intentions to reject public financing of the 2003 election. During its 2003 regular thirty-day session, the General Assembly enacted a budget bill for the 2002–04 biennium that did not fund the election campaign fund and ratified the Governor's expenditures under the Executive Spending Plan, *nunc pro tunc.* The Franklin Circuit Court dismissed the declaration of rights action as moot. *See generally* Paul E. Salamanca, *The Constitutionality of an Executive Spending Plan,* 92 Ky. L.J. 149, 152–58 (2003–04).

At the 2004 regular session of the General Assembly, the Republican-controlled Senate and the Democratic-controlled House of Representatives again deadlocked, this time on whether the 2004 executive department budget bill should include new taxation measures proposed by Republican Governor Fletcher. On March 9, 2004 (day 44 of the 60–day session), the House passed a budget bill that substantially amended the budget recommendation submitted by the Governor pursuant to KRS 48.100(1) and 48.110(6). On March 10, the House's version of the budget bill officially arrived at the Senate. On March 11, the Governor unveiled his proposed new taxation measures. On March 29 (day 58), the Senate passed its version of the budget bill, restoring many of the Governor's original recommendations and adding the Governor's tax proposals. Conference committee negotiations failed and, on April 14, 2004 (day 60), the General Assembly adjourned *sine die* without enacting an executive department budget bill for the 2004–06 biennium.

Unlike Governors Jones and Patton before him, Governor Fletcher did not reconvene the General Assembly into extraordi-

---

1. On June 27, 2002, the Chief Justice promulgated an order implementing a spending plan to cover the expenses of the judicial department from and after July 1, 2002, and issued warrants against the treasury to fund that plan. The constitutional efficacy of this order is not before us. *But see* Ky. Const. § 120, discussed *infra.*

nary session for the purpose of further budget negotiations. When asked during oral argument whether the Governor should have called an extraordinary session so that the General Assembly could attempt to resolve its differences, the attorney for the President of the Senate responded that an extraordinary session would have been "futile." Instead, the Governor announced that he, like Governor Patton before him, would formulate his own executive department spending plan, i.e., his own budget.

On May 27, 2004, the Attorney General filed this action in the Franklin Circuit Court against the Governor, the Treasurer, and the Secretary of the Finance and Administration Cabinet seeking to preclude the anticipated suspension of 153 existing statutes in the Governor's executive spending plan. Other parties, including the President of the Senate, the Speaker of the House of Representatives, individual legislators, representatives of state employees, and the Board of Trustees of the Kentucky Employees Retirement System, intervened to assert limitations on the Governor's power to suspend statutes or to spend unappropriated funds. Common Cause of Kentucky, an unincorporated self-styled "non-profit, non-partisan organization which advocates ethics and constitutional law in Kentucky," intervened on the relation of its chairman, a self-described "Kentucky taxpayer," seeking an injunction against the Governor to preclude him "from implementing any spending plan which would draw money from the State Treasury without appropriations made by the Legislature" in contravention of Section 230 of the Constitution of Kentucky.

On June 28, 2004, Governor Fletcher promulgated Executive Order 2004–650, adopting an executive department budget which he denominated a "Public Services Continuation Plan." The Order noted that:

Through its adoption of House Bill 396, the General Assembly has made appropriations for the use of the Judicial Branch totaling $234,648,400, and in House Bill 397 for the Legislative Branch totaling $40,731,400, leaving $20,739,752,600 in previously estimated revenues identified for use by the Executive Branch, as modified by the Consensus Forecasting Group estimates of June 8, 2004, for the operation and function of the Executive Branch of government.

The Public Services Continuation Plan proposed to appropriate exactly $20,739,752,600 to the executive department for its operations during fiscal year 2004–05 and authorized the Secretary of the Finance and Administration Cabinet to issue warrants against the state treasury to obtain those appropriations as needed.

On October 4, 2004, the Governor issued a proclamation convening the General Assembly into extraordinary session, but only to consider "the compensation, health insurance benefits and retirement benefits of active and retired public employees, and making an appropriation therefor." The General Assembly resolved those issues but Section 80 of the Constitution precluded it from considering any other unresolved budget issues.

On December 15, 2004, the Franklin Circuit Court declared the Public Services Continuation Plan unconstitutional but authorized its continuation until June 30, 2005,[2] after which, "absent legislative ac-

---

**2.** No doubt, the circuit court permitted the temporary continuation of the executive spending plan for reasons of expediency.

However, as will be noted later in this opinion, expediency does not justify the judicial sanction of an unconstitutional act. The bet-

tion, no public funds shall be expended from the State Treasury ..., with the exception of those funds demonstrated to be for limited and specific essential services previously approved in *Quertermous* [*Miller v. Quertermous,* 304 Ky. 733, 202 S.W.2d 389 (1947)]." On January 13, 2005, the Governor and the Secretary of the Finance and Administration Cabinet appealed. We granted transfer, CR 74.02, ordered an expedited briefing schedule, and set oral arguments for March 9, 2005. On March 8, 2005, during the course of its thirty-day regular legislative session, the General Assembly enacted both an executive department budget bill for the 2004–06 biennium and a tax bill. As it had done in its 2003 session, the General Assembly also ratified all executive department actions taken pursuant to the Public Services Continuation Plan, *nunc pro tunc.*

## I. MOOTNESS.

■ Counsel for the Governor suggested at oral argument that this appeal should now be dismissed as moot because the Public Services Continuation Plan no longer exists and the General Assembly has ratified the appropriations and expenditures made by the executive department under that plan. However, a well-known exception to the mootness doctrine occurs when an issue is "capable of repetition, yet evading review." *Lexington Herald–Leader Co., Inc. v. Meigs,* 660 S.W.2d 658, 661 (Ky.1983) (quoting *Neb. Press Ass'n v. Stuart,* 427 U.S. 539, 546, 96 S.Ct. 2791, 2797, 49 L.Ed.2d 683 (1976)); *see also Woods v. Commonwealth,* 142 S.W.3d 24, 31 (Ky.2004); *Commonwealth v. Hughes,* 873 S.W.2d 828, 830 (Ky.1994). A two-part test governs the application of this exception: "(1) is the 'challenged action too short in duration to be fully litigated prior to its cessation or expiration and (2) [is

there] a reasonable expectation that the same complaining party would be subject to the same action again." ' *Hughes,* 873 S.W.2d at 830 (quoting *In re Commerce Oil Co.,* 847 F.2d 291, 293 (6th Cir.1988)). The present case satisfies both prongs.

■ On three occasions within a ten-year period, the General Assembly convolved itself into a partisan deadlock and adjourned *sine die* without enacting an executive department budget bill. After the two most recent such occasions, the respective governors promulgated their own budgets and ordered appropriations drawn from the treasury in accordance therewith. On each occasion, lawsuits were filed to test the constitutionality of those actions. On each occasion, the General Assembly enacted an executive department budget bill and ratified the governor's actions before the issue could be finally resolved by the Court of Justice. Having no assurance that similar partisan brinkmanship will not recur in the General Assembly, resulting in future gubernatorially promulgated budgets, we conclude that this issue is capable of repetition, yet evading review, and will address its merits. *See Burlington Northern R. Co. v. Bhd. of Maint. of Way Employees,* 481 U.S. 429, 436 n. 4, 107 S.Ct. 1841, 1846 n. 4, 95 L.Ed.2d 381 (1987) ("Because these same parties are reasonably likely to find themselves again in dispute over the issues raised in this petition, and because such disputes typically are resolved quickly by ... legislative action, this controversy is one that is capable of repetition yet evading review.").

## II. POLITICAL QUESTION.

■ The President of the Senate suggests that when a budget deadlock occurs, a court can supervise the Governor's

ter course would have been to stay the judg-        ment pending appeal.

expenditures on an item-by-item basis to ensure that they do not exceed the constitutional exception for "essential services" allegedly created in *Miller v. Quertermous*, 304 Ky. 733, 202 S.W.2d 389 (1947). The Governor responds that budgetary matters, including determinations of what services are essential or not, are nonjusticiable political questions that should be reserved to the other departments of government.

■ The "political question" doctrine is grounded primarily in the separation of powers. *Baker v. Carr*, 369 U.S. 186, 210, 82 S.Ct. 691, 706, 7 L.Ed.2d 663 (1962). Under this doctrine, the judicial department should not interfere in the exercise by another department of a discretion that is committed by a textually demonstrable provision of the Constitution to the other department, *Powell v. McCormack*, 395 U.S. 486, 518, 89 S.Ct. 1944, 1962, 23 L.Ed.2d 491 (1969), or seek to resolve an issue for which it lacks judicially discoverable and manageable standards, *Vieth v. Jubelirer*, 541 U.S. 267, 276, 124 S.Ct. 1769, 1776, 158 L.Ed.2d 546 (2004). *See, e.g., Philpot v. Haviland*, 880 S.W.2d 550, 554 (Ky.1994) (determination of what is a "reasonable time" within which to report a bill out of a legislative committee under Section 46 of the Constitution is a purely legislative issue); *Dalton*, 304 S.W.2d at 345 (wisdom of fiscal policy, levy of taxes, and appropriation of revenue is outside the purview of judicial authority); *Lakes v. Goodloe*, 195 Ky. 240, 242 S.W. 632, 635 (1922) ("The expediency of a statute, or whether or not the public weal demands its enactment, are political questions, which address themselves to the legislative department of the government ....."). We agree with the Governor that the judicial department should neither inject itself nor be injected into the details of the executive department budget process. What consti-

tutes an essential service depends largely on political, social and economic considerations, not legal ones. *Vaughn v. Knopf*, 895 S.W.2d 566, 567 (Ky.1995) (declaring the statute requiring circuit court oversight of sheriff's budget unconstitutional: "In acting on these annual budget requests, the judges would, *per se*, be injected into the political side of the executive branch offices.").

The issue in this case, however, is not the efficacy or necessity of a particular appropriation, but whether the Governor has any constitutional authority to determine what are essential services or to unilaterally order *any* appropriations from the treasury.

> Deciding whether a matter has in any measure been committed by the Constitution to another branch of government, or whether the action of that branch exceeds whatever authority has been committed, is itself a delicate exercise in constitutional interpretation, and is a responsibility of this Court as ultimate interpreter of the Constitution.
>
> . . .
>
> The courts cannot reject as "no law suit" a bona fide controversy as to whether some action denominated "political" exceeds constitutional authority.

*Baker*, 369 U.S. at 211, 217, 82 S.Ct. at 706, 710. The issue presented by this case is a constitutional issue, not a political one; thus, it is justiciable. *Cf. Rose v. Council for Better Educ., Inc.*, 790 S.W.2d 186, 209 (Ky.1989) ("To allow the General Assembly (or, in point of fact, the Executive) to decide whether its actions are constitutional is literally unthinkable.")

### III. SEPARATION OF POWERS.

Section 27 of the Constitution of Kentucky provides:

> The powers of the government of the Commonwealth of Kentucky shall be di-

vided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another.

Section 28 provides:

No person or collection of persons being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.

Section 28's "unusually forceful command," *Ex Parte Auditor of Public Accounts*, 609 S.W.2d 682, 684 (Ky.1980), has no counterpart in the United States Constitution. It is reputed to have been penned by Thomas Jefferson.[3]

When Mr. Jefferson returned from France, the federal constitution had been adopted; and, having been appointed secretary of state, he obtained permission to go to Monticello for some months. John Breckinridge and George Nicholas paid him a visit there, and informed him that Kentucky was about to frame a constitution for herself, and that Virginia was about to permit Kentucky to become a separate and independent state. He told them that there was danger in the federal constitution, because the clause defining the powers of the departments of government was not sufficiently guarded, and that the first thing to be provided for by the Kentucky constitution should be to confine the judiciary to its powers, and the legislative and executive to theirs. Mr. Jefferson drew the form of the provision, and gave it to Nicholas and Breckinridge; and it was taken by Nicholas to the convention which met at Danville, and there presented,—Breckinridge not

being present at the convention. There was much discussion and dissent when the article was offered, but, when its author was made known, the respect of Kentucky for the great name of Jefferson carried it through, and it was at once adopted.

*Comm'rs of Sinking Fund v. George*, 104 Ky. 260, 47 S.W. 779, 785 (1898) (Du Relle, J., dissenting). *See also Rouse v. Johnson*, 234 Ky. 473, 28 S.W.2d 745, 752 (1930) (Willis, J., dissenting); *Sibert v. Garrett*, 197 Ky. 17, 246 S.W. 455, 457 (1922); *Purnell v. Mann*, 105 Ky. 87, 48 S.W. 407,; 50 S.W. 264, 264 (1899) (Du Relle, J., dissenting); Sheryl G. Snyder & Robert M. Ireland, *The Separation of Governmental Powers Under the Constitution of Kentucky: A Legal and Historical Analysis of L.R.C. v. Brown*, 73 Ky. L.J. 165, 206 (1984–85).

Though the separation of powers is not as forcefully enunciated in the United States Constitution, the principal drafter of that document clearly intended that there would be a strict separation. "If there is a principle in our Constitution, indeed in any free Constitution more sacred than another, it is that which separates the legislative, executive and judicial powers." James Madison, Speech on the Floor of the House of Representatives, June 22, 1789, *in* 1 Annals of Congress 581. The United States Supreme Court has consistently allayed Jefferson's purported fears. *E.g., Plaut v. Spendthrift Farm, Inc.*, 514 U.S. 211, 239, 115 S.Ct. 1447, 1463, 131 L.Ed.2d 328 (1995) ("[T]he doctrine of separation of powers is a structural safeguard ... a prophylactic device, establishing high walls and clear distinctions because low walls and vague distinctions will not be judicially defensible in the

---

**3.** Judge Du Relle cited to no authority for the following account of Jefferson's role. Later authorities cite only to Judge Du Relle's dissents in *George* and *Purnell, infra.*

heat of interbranch conflict."); *Immigration and Naturalization Serv. v. Chadha*, 462 U.S. 919, 951, 103 S.Ct. 2764, 2784, 77 L.Ed.2d 317 (1983) ("The Constitution sought to divide the delegated powers of the new federal government into three defined categories, legislative, executive and judicial, to assure, as nearly as possible, that each Branch of government would confine itself to its assigned responsibility. The hydraulic pressure inherent within each of the separate Branches to exceed the outer limits of its power, even to accomplish desirable objectives, must be resisted."); *Nixon v. Fitzgerald*, 457 U.S. 731, 760–761, 102 S.Ct. 2690, 2707, 73 L.Ed.2d 349 (1982) ("The essential purpose of the separation of powers is to allow for independent functioning of each coequal branch of government within its assigned sphere of responsibility, free from risk of control, interference, or intimidation by other branches."); *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 588–89, 72 S.Ct. 863, 867, 96 L.Ed. 1153 (1952) (only Congress has authority to authorize seizure of private property for public use; consequently, the President exceeded his executive powers by seizing steel mills to avert a nationwide shut-down by labor union strike).

Likewise, we and our predecessor court have interpreted Sections 27 and 28 to mandate a strict separation of powers. Rejecting an argument that the provisions should be liberally construed in the modern era to permit some legislative encroachment on executive powers, Snyder & Ireland, *supra*, at 206–07, we noted in *Legislative Research Com'n ex rel. Prather v. Brown* ["*L.R.C. v. Brown*"], 664 S.W.2d 907 (Ky.1984), that:

> Our present constitution contains explicit provisions which, on the one hand, *mandate* separation among the three branches of government, and on the other hand, specifically *prohibit* incursion of one branch of government into the powers and functions of the others.
>
> . . .
>
> [I]t has been our view, in interpreting Sections 27 and 28, that the separation of powers doctrine is fundamental to Kentucky's tri-partite system of government and must be "strictly construed."
>
> . . .
>
> The precedents established by this court have been uniform in retaining the goals set out by the framers. The separation of powers doctrine is set in the concrete of history and legal precedent.

*Id.* at 912, 914. *See also Diemer v. Commonwealth*, 786 S.W.2d 861, 864 (Ky.1990) ("Kentucky is a strict adherent to the separation of powers doctrine."); *Sibert*, 246 S.W. at 458 ("The purpose was to have each of them to so operate in their respective spheres as to create checks to the operations of the others and to prevent the formation by one department of an oligarchy through the absorption of powers belonging to the others.").

As anticipated by the "except" clause in Section 28, the Constitution does articulate some exceptions to the strict separation of powers. For example, the Governor's veto power, Ky. Const. § 88, is a legislative function. *Arnett v. Meredith*, 275 Ky. 223, 121 S.W.2d 36, 37 (1938). The power of the Senate to try impeachments, Ky. Const. § 67, is a judicial function. And the Chief Justice's administrative powers, Ky. Const. § 110(5)(b), are executive functions. Further, while the General Assembly cannot delegate its power to make law, it can make a law that delegates the power to determine some fact or state of things upon which the law makes its own action depend—so long as the law establishes policies and standards governing the exercise of that delegation. *L.R.C. v. Brown*, 664 S.W.2d at 915; *Bloemer v. Turner*, 281

Ky. 832, 137 S.W.2d 387, 391 (1939). *See Bd. of Trustees v. Attorney Gen.*, 132 S.W.3d 770, 781–85 (Ky.2003), for a detailed discussion of the "nondelegation doctrine." The authority of the General Assembly to make a limited delegation to the executive department has, on occasion, been extended to expenditures of excess or emergency funds. *Hopkins v. Ford*, 534 S.W.2d 792, 795–96 (Ky.1976); *Commonwealth ex rel. Meredith v. Johnson*, 292 Ky. 288, 166 S.W.2d 409, 412 (1942). In fact, KRS 48.150 anticipates that the budget will appropriate funds to each department of government to meet unexpected contingencies or emergencies. However, in the absence of a proper delegation of authority by one department to another, or a specific exception articulated by the Constitution, itself, Section 28 has erected a "high wall," *Plaut*, 514 U.S. at 239, 115 S.Ct. at 1463, which precludes the exercise by one department of a power vested solely in either of the others.

> The doctrine of the separation of powers was adopted ... not to promote efficiency but to preclude the exercise of arbitrary power. The purpose was not to avoid friction, but, by means of the inevitable friction incident to the distribution of the governmental powers among three departments, to save the people from autocracy.

*Myers v. United States*, 272 U.S. 52, 293, 47 S.Ct. 21, 85, 71 L.Ed. 160 (1926) (Brandeis, J., dissenting).

## IV. APPROPRIATIONS POWER.

■ I simply believe that "Congress shall make no law" means Congress shall make no law.

Hugo Black, *A Constitutional Faith* 45 (1969), referring, of course, to the First Amendment of the United States Constitution. That simple textual interpretation mirrors the primary rule of constitutional construction: "There is no room for construction of a Constitution outside of the words themselves, if they are unambiguous ...." *Button v. Drake*, 302 Ky. 517, 195 S.W.2d 66, 68 (1946).

> When the framers of the Constitution use language that is in no sense ambiguous, it is not a function of this court to construe that language as meaning something that the framers of the Constitution did not say, or to hold that while the Constitution says something definitely and unequivocally, no special importance is to be attached to its language.

*Harrod v. Hatcher*, 281 Ky. 712, 137 S.W.2d 405, 407 (1940). *See also Pardue v. Miller*, 306 Ky. 110, 206 S.W.2d 75, 78 (1947) ("The basic rule ... is to interpret a constitutional provision according to what was said and not what might have been said ...."). That rule applies to the unambiguous words of Section 230 of the Constitution of Kentucky, *viz:*

> No money shall be drawn from the State Treasury, except in pursuance of appropriations made by law ....

We have consistently held that this provision means exactly what it says. *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d 437, 441 (Ky.1986) ("It is clear that the power of the dollar—the raising and expenditure of the money necessary to operate state government—is one which is within the authority of the legislative branch of government. The Constitution of the Commonwealth so states and we have so stated."); *L.R.C. v. Brown*, 664 S.W.2d at 925 ("The budget, which provides the revenue for the Commonwealth and which determines how that revenue shall be spent, is fundamentally a legislative matter."); *Ferguson v. Oates*, 314 S.W.2d 518, 521 (Ky.1958) ("[T]he purpose of [Section 230] was to prevent the expenditure of the State's money without the

consent of the Legislature.") (internal citation and quotation omitted).

Article I, Section 9, Clause 7 of the United States Constitution contains wording almost identical to that of Section 230, and the United States Supreme Court has consistently given that provision its literal meaning. *Cincinnati Soap Co. v. United States,* 301 U.S. 308, 321, 57 S.Ct. 764, 770, 81 L.Ed. 1122 (1937) ("It means simply that no money can be paid out of the Treasury unless it has been appropriated by an act of Congress."); *Reeside v. Walker,* 52 U.S. (11 How.) 272, 291, 13 L.Ed. 693 (1850) ("However much money may be in the Treasury at any one time, not a dollar of it can be used in the payment of any thing not thus previously sanctioned."). Its purpose is to vest in Congress, the branch of government that is most representative of the people, the power to determine how the people's money will be spent. *Office of Pers. Mgmt. v. Richmond,* 496 U.S. 414, 427–28, 110 S.Ct. 2465, 2473, 110 L.Ed.2d 387 (1990) ("But the Clause has a more fundamental and comprehensive purpose .... It is to assure that public funds will be spent according to the letter of the difficult judgments reached by Congress as to the common good and not according to the individual favor of Government agents or the individual pleas of litigants."); *Cincinnati Soap Co.,* 301 U.S. at 321, 57 S.Ct. at 770 ("The provision of the Constitution ... that, 'No Money shall be drawn from the Treasury, but in Consequence of Appropriations made by Law,' was intended as a restriction upon the disbursing authority of the Executive department ....").

> The object is apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity, in the disbursements of the public money. As all the taxes raised from the people, as well as revenues arising from other sources, are to be applied to the discharge of the expenses, and debts, and other engagements of the government, it is highly proper, that congress should possess the power to decide how and when any money should be applied for these purposes. If it were otherwise, the executive would possess an unbounded power over the public purse of the nation; and might apply all its moneyed resources at his pleasure. The power to control and direct the appropriations, constitutes a most useful and salutary check upon profusion and extravagance, as well as upon corrupt influence and public peculation....

Joseph Story, 2 *Commentaries on the Constitution of the United States* § 1348 (3d ed. 1858).

> It is an axiom of American government that the legislature holds the purse strings. The federal and most state constitutions, for example, require that the budget originate in the House of Representatives, the arm of government most representative of the populace. This is traditionally viewed as the means by which the representatives of the people hold their most powerful check and balance upon the executive branch.

Snyder & Ireland, *supra,* at 225.

■ The Governor asserts that Section 230 applies only if the General Assembly has enacted a budget bill. As noted at the outset of this opinion, there is no provision in the Constitution of Kentucky requiring the General Assembly to enact a budget bill. Such is purely a statutory requirement. Since Section 230 preexisted that statutory scheme, the Framers could not have intended for the Section to apply only when the General Assembly enacts a budget bill. Accordingly, we hold that, in the absence of a specific appropriation, or a statutory, constitutional, or federal mandate as discussed below, the unambiguous

language of Section 230 prohibits the withdrawal of funds from the state treasury.

## V.  STATUTORY, CONSTITUTIONAL AND FEDERAL MANDATES.

KRS 41.110 provides:

No public money shall be withdrawn from the Treasury for any purpose other than that for which its withdrawal is proposed, nor unless it has been appropriated by the General Assembly or is a part of a revolving fund, and has been allotted as provided in KRS 48.010 to 48.800, and then only on the warrant of the Finance and Administration Cabinet. The provisions of this section do not apply to withdrawals of funds from state depository banks for immediate redeposit in other state depository banks or to funds held in trust for the security of bond holders.

Where the General Assembly has mandated that specific expenditures be made on a continuing basis, or has authorized a bonded indebtedness which must be paid, such is, in fact, an appropriation. Otherwise, the General Assembly has not delegated its constitutional power of appropriation to the executive department. It has even forbidden the expenditure of surplus monies in the general and road funds. KRS 48.700(8); KRS 48.710(8).

There are statutes that mandate appropriations even in the absence of a budget bill. *E.g.*, KRS 18A.015(2) ("Appropriations shall be made from the general expenditure fund to the cabinet to meet the estimated pro rata share of the cost of administering the provisions of this chapter ...."); KRS 44.100 ("All amounts necessary to pay awards and cost of operation assessed by the board [of claims] against all other cabinets or agencies of the Commonwealth shall be paid out of the general fund of the Commonwealth, upon warrants drawn by the secretary of the Finance and

Administration Cabinet upon the State Treasurer."); KRS 45A.275 ("The first five hundred thousand dollars ($500,000) of any Kentucky court judgment against the Commonwealth awarding damages on a contract claim under the provisions of KRS 45A.240 to 45A.270 shall be a necessary governmental expense and payment shall be approved by the Finance and Administration Cabinet and paid by the State Treasurer. Appropriations for these judgments shall be continued appropriations."); KRS 61.565(1) ("Each employer participating in the State Police Retirement System ... and each employer participating in the Kentucky Employees Retirement System ... shall contribute annually to the respective retirement system ...."). There are others—but they are substantially less than legion. In those instances, the General Assembly has already made the necessary appropriations. *White v. Davis*, 108 Cal.App.4th 197, 133 Cal.Rptr.2d 691, 699–700 (2002), *reversed in part on other grounds by White v. Davis*, 30 Cal.4th 528, 133 Cal.Rptr.2d 648, 68 P.3d 74 (2003).

■ However, the mere existence of a statute that can be implemented only if funded does not mandate an appropriation. "[T]he General Assembly is permitted through the reduction or elimination of an appropriation, to effectively eliminate the efficacy of existing statutes ...." *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d at 441. In fact, the State Senate's 2002 refusal to fund the election campaign fund established in KRS 121A.020 was the immediate cause of the collapse of that session's budget negotiations. Obviously, the mere existence of KRS 121A.020 was not a mandate to fund it.

■ A similar crisis occurred in the federal government in 1980 when it became apparent that Congress would not pass a federal budget or a budget continuation

plan before October 1, the beginning of the next fiscal year. Former United States Attorney General Benjamin R. Civiletti opined, when interpreting 31 U.S.C. § 1341, the "Anti–Deficiency Act," which precludes any officer or employee of the government from making or authorizing the expenditure of unappropriated funds, that:

> [S]tatutory authority to incur obligations in advance of appropriations ... may not ordinarily be inferred, in the absence of appropriations, from the kind of broad, categorical authority, standing alone, that often appears, for example, in the organic statutes of governmental agencies.

5 Op. Off. Legal Counsel 1, 2 (1980) (quoted in 43 Op. Atty. Gen. 293, 297 (1981)). We agree. Only those statutes specifically mandating that payments or contributions be made can be interpreted as self-executing appropriations. A mandated appropriation cannot be inferred from the mere existence of an unfunded statute.

■ In contrast, "constitutional provisions are *mandatory* and never directory." *Arnett v. Sullivan,* 279 Ky. 720, 132 S.W.2d 76, 78 (1939). Certain provisions of our Constitution mandate payments for services rendered, *viz:*

Section 42 ("The members of the General Assembly shall severally receive from the State Treasury compensation for their services ....");

Section 74 ("The Governor and Lieutenant Governor shall at stated times receive for the performance of the duties of their respective offices compensation to be fixed by law.");

Section 86 ("The President of the Senate shall receive for his services the same compensation which shall, for the same period, be allowed to the Speaker of the House of Representatives, and during the time he administers the government as Governor, he shall receive the same compensation which the Governor would have received had he been employed in the duties of his office.");

Section 96 ("All officers mentioned in Section 95 shall be paid for their services by salary, and not otherwise.");

Section 98 ("The compensation of the Commonwealth's Attorney shall be by salary and such percentage of fines and forfeitures as may be fixed by law, and such salary shall be uniform in so far as the same shall be paid out of the State Treasury, and not to exceed the sum of five hundred dollars per annum ....");

Section 106 ("In counties or cities having a population of seventy-five thousand or more, the Clerks of the respective Courts thereof (except the Clerk of the City Court), the Marshals, the Sheriffs and the Jailers, shall be paid out of the State Treasury, by salary to be fixed by law, the salaries of said officers and of their deputies and necessary office expenses not to exceed seventy-five per centum of the fees collected by said officers, respectively, and paid into the Treasury.");

Section 120 ("All justices and judges shall be paid adequate compensation which shall be fixed by the General Assembly. All compensation and necessary expenses of the Court of Justice shall be paid out of the State Treasury. The compensation of a justice or judge shall not be reduced during his term."); and

Section 235 ("The salaries of public officers shall not be changed during the terms for which they were elected ....").

■ There are other constitutional mandates that can only be implemented by the expenditure of funds from the treasury. These are:

Section 40 ("Each House of the General Assembly shall keep and publish daily a journal of its proceedings . . . .");

Section 53 ("The General Assembly shall provide by law for monthly investigations into the accounts of the Treasurer and Auditor of Public Accounts . . . .");

Section 147 ("The General Assembly shall provide by law for the registration of all persons entitled to vote in cities and towns having a population of five thousand or more . . . .");

Section 151 ("The General Assembly shall provide suitable means for depriving of office any person who, to procure his nomination or election, has . . . been guilty of any unlawful use of money, or other thing of value, or has been guilty of fraud, intimidation, bribery, or any other corrupt practice . . . .");

Section 183 ("The General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State.");

Section 220 ("The General Assembly shall provide for maintaining an organized militia . . . .");

Section 221 ("The organization, equipment and discipline of the militia shall conform as nearly as practicable to the regulations for the government of the armies of the United States.");

Section 223 ("The General Assembly shall provide for the safekeeping of the public arms, military records, relics and banners of the Commonwealth of Kentucky.");

Section 244a ("The General Assembly shall prescribe such laws as may be necessary for the granting and paying of old persons an annuity or pension.");

Section 252 ("It shall be the duty of the General Assembly to provide by law . . . for the establishment and maintenance of an institution or institutions for the detention, correction, instruction and reformation of all persons under the age of eighteen years, convicted of such felonies· and such misdemeanors as may be designated by law. Said institution shall be known as the 'House of Reform.'"); and

Section 254 ("The Commonwealth shall maintain control of the discipline, and provide for all supplies, and for the sanitary conditions of the convicts . . . .").

Unlike unfunded statutes, which are creatures of the General Assembly who may choose to fund them or not, these constitutional mandates must be implemented. "The Kentucky Constitution is, in matters of state law, the supreme law of this Commonwealth to which all acts of the legislature, the judiciary and any government agent are subordinate." *Kuprion v. Fitzgerald*, 888 S.W.2d 679, 681 (Ky.1994). The General Assembly cannot prevent the implementation of constitutional mandates by simply withholding its appropriations power. In the absence of appropriations by the General Assembly, the Treasurer must fund these constitutional mandates at no more than existing levels until the General Assembly provides otherwise.

■ Finally, there are what the parties in this case have referred to as "federal mandates," *i.e.*, programs or requirements established by federal law that require expenditure of state funds. While the constitutionality of such mandates is currently in doubt, *Printz v. United States*, 521 U.S. 898, 925, 117 S.Ct. 2365, 2380, 138 L.Ed.2d 914 (1997); *New York v. United States*, 505 U.S. 144, 188, 112 S.Ct. 2408, 2435, 120 L.Ed.2d 120 (1992), that issue is not before us. Nor do we decide whether a state, having accepted federal benefits, can opt out of an otherwise voluntary participation in a federal program. *E.g.*, 29 U.S.C. § 651, *et seq.* (Occupational Safety and

Health Act of 1970); 30 U.S.C. § 1201, *et seq.* (Surface Mining Control and Reclamation Act of 1977); 33 U.S.C. § 1251, *et seq.* (Clean Water Act); 42 U.S.C. § 6901, *et seq.,* (Resource Conservation and Recovery Act of 1976); 42 U.S.C. § 7401, *et seq.* (Clean Air Act). We simply hold that to the extent the Supremacy Clause of the United States Constitution, U.S. Const. art. VI, cl. 2, requires compliance with any valid federal mandate, it must be funded by the Treasurer notwithstanding Section 230 of the Constitution of Kentucky.

However, absent a statutory, constitutional, or valid federal mandate, Section 230 precludes the withdrawal of funds from the state treasury except pursuant to a specific appropriation by the General Assembly.

## VI. CONTINUATION BUDGET.

■ The Attorney General posits that, in addition to statutory, constitutional, and federal mandates, the Governor ought to be able to look to the immediately preceding biennial budget as a "guide" for additional appropriations, *i.e.,* a kind of "quasi-continuation budget."

From 1918 until 1983, there existed statutory authority for a continuation budget in Kentucky, subject to substantial executive department leeway, *viz:*

If the General Assembly fails to make an appropriation for any fiscal year for any purpose required to be executed by provisions of existing laws, or if the Governor vetoes an appropriation essential to the carrying out of any such purpose, an appropriation equal in amount to the appropriation made, or deemed to have been made under this section, for that purpose for the fiscal year next preceding, exclusive of any such appropriations for extraordinary expenses and capital outlays, shall be deemed to have been made and shall continue available from year to year until an appropriation has been made as provided in this chapter and has become effective. If any such appropriation for the fiscal year next preceding is applicable alike for ordinary recurring expenses, extraordinary expenses, and capital outlays, the Executive Department for Finance and Administration shall determine what proportion thereof shall be deemed under the provisions of this section to have been appropriated for ordinary recurring expenses by the General Assembly for the next fiscal year. Each appropriation or the proportion of each appropriation that is continued under this section shall be included in the budget and made available for expenditure by allotments as provided in this chapter.

KRS 45.120. The statute was repealed effective July 1, 1983. 1982 Ky. Acts, ch. 450, § 79. We interpret that repeal as a specific legislative rejection of the solution proffered by the Attorney General. *Cf. Youngstown Sheet & Tube Co. v. Sawyer,* 343 U.S. at 586, 72 S.Ct. at 866 (finding no Congressional authority for President's seizure of steel mills partially because, "[w]hen the Taft–Hartley Act was under consideration in 1947, Congress rejected an amendment which would have authorized such governmental seizures in cases of emergency.").

Thus, we are left with KRS 48.310(1) ("No provision of a branch budget bill shall be effective beyond the second fiscal year from the date of its enactment.") and the ancient principle that each legislature is a free and independent body and cannot control the conduct of its successor except by acts in the form of binding contracts. *Bd. of Trustees v. Attorney Gen.,* 132 S.W.3d at 789; *City of Mt. Sterling v. King,* 126 Ky. 526, 104 S.W. 322, 322 (1907); *Swift & Co. v. City of Newport,* 70 Ky. (7 Bush) 37, 41 (1870). There presently exists no au-

thority for a continuation budget in Kentucky.

## VII. GOVERNOR'S CONSTITUTIONAL POWERS.

■ The Governor asserts that when the General Assembly fails to exercise its appropriations power to fund the operations of the executive department, he (the Governor) possesses the inherent power to order the appropriations necessary to prevent the imminent collapse of governmental services. He cites Sections 69 and 81 of the Constitution as the source of that power.

Section 69 provides: "The supreme executive power of the Commonwealth shall be vested in a Chief Magistrate, who shall be styled the 'Governor of the Commonwealth of Kentucky.'" That provision only vests the Governor with executive powers, just as Section 29 vests the General Assembly with legislative powers and Section 109 vests the Court of Justice with judicial powers. Manifestly, Section 69 does not vest the Governor with legislative powers, which are specifically reserved by Sections 28 and 29 solely to the legislative department. Section 81 provides: "He shall take care that the laws be faithfully executed." The Governor asserts that he cannot faithfully execute the laws enacted by the General Assembly without the funds necessary to do so. However, as noted earlier in this opinion, the mere existence of a law does not mean that it must be implemented if doing so requires the expenditure of unappropriated funds. *Commonwealth ex rel. Armstrong v. Collins*, 709 S.W.2d at 441.

The same Constitutional powers and duties described in Sections 69 and 81 are granted to the President of the United States by Article II, Sections 1 and 3 of the United States Constitution. As Justice Black wrote in the lead opinion in the *Youngstown* case:

> In the framework of our Constitution, the President's power to see that the laws are faithfully executed refutes the idea that he is to be a lawmaker. The Constitution limits his functions in the lawmaking process to the recommending of laws he thinks wise and the vetoing of laws he thinks bad. And the Constitution is neither silent nor equivocal about who shall make laws which the President is to execute. The first section of the first article says that "All legislative Powers herein granted shall be vested in a Congress of the United States."

*Youngstown*, 343 U.S. at 587–88, 72 S.Ct. at 867. *See also Myers v. United States*, 272 U.S. at 295, 47 S.Ct. at 85 (Holmes, J., dissenting) ("The duty of the President to see that the laws be executed is a duty that does not go beyond the laws or require him to achieve more than Congress sees fit to leave within his power."). The Governor has no constitutional authority to exercise legislative powers even when the General Assembly has failed to do so.

## VIII. ALLEGED EMERGENCY POWERS.

The Governor also cites the opinions of our predecessor court in *Miller v. Quertermous*, 304 Ky. 733, 202 S.W.2d 389 (1947), and *Rhea v. Newman*, 153 Ky. 604, 156 S.W. 154 (1913), for the proposition that he may expend unappropriated funds to provide essential services during emergencies. We easily distinguish *Rhea* because the funds in that case had, in fact, been appropriated by the General Assembly. There simply was insufficient money in the treasury to pay the warrant when it was submitted. A statute, 1910 Ky. Acts, ch. 72, § 3, provided that, in such a circumstance, the Treasurer should endorse the warrant as bearing five percent interest from the date of its presentation. The

issue was whether, considering the extent of other state indebtedness, that endorsement would violate Section 49 of the Constitution, which authorizes the General Assembly to contract debts to meet casual deficits but requires that such debts not exceed a maximum of $500,000. *Rhea*, 156 S.W. at 155. The case had nothing to do with Section 230.

*Quertermous* did have to do with Section 230, but has been regarded as an anomaly, at best. There, the General Assembly made what it believed to be sufficient appropriations for the maintenance of state prisons, correctional institutions for children, and mental institutions. Unfortunately, with the elimination of the price control system in effect during World War II, the cost of living rose unexpectedly and the appropriated funds proved insufficient to pay the necessary, ordinary and recurring expenses of those institutions. The Commissioner of Welfare sued the State Treasurer and the Commissioner of Finance for funds necessary to continue the operation of the institutions. Noting that the appropriated funds would expire on May 15, 1947 (the opinion was rendered on May 16, 1947), and that there was a substantial surplus in the treasury, *Quertermous*, 202 S.W.2d at 390, the court ordered the Treasurer to pay the funds necessary to operate the institutions. *Id.* at 392.

We are justified in assuming that the Legislature was fully cognizant of its obligation to make such appropriation for the care of these institutions and inmates. The intention so to care for them is evidenced by the appropriation made. The fact that an unanticipated rising cost of living later shows the estimate to be erroneous, in no way operates to destroy that proper intention, nor could it in any way be justifiable grounds for criticism. A great untouched surplus of public funds, collect-

ed for public purposes, is on hand. An unexpected and unanticipated emergency requiring more than emotional gestures confronts us.

*Id.* at 391–92. Thus, the court inferred an intent on the part of the General Assembly to provide the additional funds for the operation of the institutions from the fact that it had already appropriated what it believed to be sufficient funds for their operation, and from the fact that a surplus of funds was on hand in the treasury sufficient to pay for their continued operation. The opinion can be partially justified by the constitutional mandates of Sections 252 and 254 and partially explained by expediency (though there is no explanation why the Commissioner of Welfare did not ask the Governor to call an extraordinary session of the General Assembly to obtain a proper legislative appropriation of the necessary funds, a process that would have required less time than it took to litigate the issue through the trial and appellate courts).

Nine years later, the Attorney General sued the Commissioner of Finance for funds needed to operate his office in excess of those appropriated by the General Assembly, citing *Quertermous*. *Ferguson v. Oates*, 314 S.W.2d at 519–20. Recognizing the fundamental impropriety of a court order directing payment of unappropriated funds to provide to the executive department additional funds that the legislature had deemed unnecessary, the court in *Ferguson* expressly limited *Quertermous* to its facts. "[T]he court's action was 'brought about by an inexorable necessity coupled with an inescapable responsibility,' and the case should not be considered as precedent except under comparable conditions." *Ferguson*, 314 S.W.2d at 520. In fact, despite the *Quertermous* court's obvious good intentions when faced with seemingly insoluble facts, the decision was *pri-*

*ma facie* an unconstitutional encroachment by the executive and judicial departments on the powers of the legislative department. Good intentions do not justify unconstitutional acts. *Dishman v. Coleman,* 244 Ky. 239, 50 S.W.2d 504, 508 (1932) (State Treasurer held personally liable for expenditure of unappropriated funds "even though the officer thought he was doing what was best for the commonwealth, and had the concurrence of the Attorney General at the time." [4]).

■■■ We reject the proposition that a Governor can unilaterally declare an emergency and spend unappropriated funds to resolve it. As Justice Jackson said in his famous concurring opinion in the *Youngstown* case:

> The Solicitor General lastly grounds support of the seizure upon nebulous, inherent powers never expressly granted but said to have accrued to the office from the customs and claims of preceding administrations. The plea is for a resulting power to deal with a crisis or an emergency according to the necessities of the case, the unarticulated assumption being that necessity knows no law.
>
> . . .
>
> The appeal, however, that we declare the existence of inherent powers *ex necessitate* to meet an emergency asks us to do what many think would be wise, although it is something the forefathers omitted. They knew what emergencies were, knew the pressures they engender for authoritative action, knew, too, how they afford a ready pretext for usurpation. We may also suspect that they suspected that emergency powers would tend to kindle emergencies.

. . .

> [E]mergency powers are consistent with free government only when their control is lodged elsewhere than in the Executive who exercises them.
>
> . . .
>
> With all its defects, delays and inconveniences, men have discovered no technique for long preserving free government except that the Executive be under the law, and that the law be made by parliamentary deliberations.

*Youngstown,* 343 U.S. at 646, 649–50, 652, 655, 72 S.Ct. at 875–76, 877, 878, 880 (Jackson, J., concurring).

■■■ The Governor possesses no "emergency" or "inherent" powers to appropriate money from the state treasury that the General Assembly, for whatever reason, has not appropriated. *Cf. Brown v. Barkley,* 628 S.W.2d 616, 623 (Ky.1982) ("Practically speaking, except for those conferred upon him specifically by the Constitution, [the Governor's] powers, like those of the executive officers created by Const. Sec. 91, are only what the General Assembly chooses to give him."). Nor does the Court of Justice have the power to confer such authority. *Miller v. Quertermous* is overruled to the extent it holds or can be interpreted otherwise.

## IX. SUSPENSION OF STATUTES.

■■■ As earlier noted, the Attorney General initiated this action to prevent the Governor's anticipated suspension of 153 statutes. Among the statutes that the parties to this appeal claim were actually suspended in the Public Services Continuation Plan were KRS 18A.010(2) (number of state employees limited to 33,000); KRS

---

**4.** *Dishman* noted that the General Assembly had the power to appropriate funds to pay the judgment against the Treasurer, *id.* at 508, a solution similar to the General Assembly's ultimate ratifications of the executive spending plans promulgated by Governors Patton and Fletcher, respectively.

18A.355(1) (automatic 5% annual pay increases for all state employees); KRS 42.4585 (allocation of Local Government Economic Assistance Funds); KRS 61.565(2) (delegation of authority to Kentucky Retirement Systems Board of Trustees to determine employer contribution rates necessary to adequately fund the Kentucky Employees Retirement System).

Section 15 of our Constitution provides: "No power to suspend laws shall be exercised unless by the General Assembly or its authority." Since this provision is a part of the Bill of Rights, the Governor could not suspend statutes even if he possessed "emergency" or "inherent" powers under Sections 69 and 81. Ky. Const. § 26 ("To guard against transgression of the high powers which we have delegated, We Declare that everything in this Bill of Rights is excepted out of the general powers of government . . . ."). The suspension of statutes by a Governor is also antithetical to the constitutional duty to "take care that the laws be faithfully executed." Ky. Const. § 81. *A fortiori*, the suspension of any statutes by the Governor's Public Services Continuation Plan was unconstitutional and invalid *ab initio*.

However, neither the parties representing state employees[5] nor the Board of Trustees of the Kentucky Employees Retirement System presently seek remedial relief from the suspensions of KRS 18A.355(1) and KRS 61.565(2), admitting that those issues were resolved during the 2004 extraordinary session of the General Assembly.

## X.  CONCLUSION.

Some truths are so basic that, like the air around us, they are easily overlooked. Much of the Constitution is concerned with setting forth the form of our government, and the courts have traditionally invalidated measures deviating from that form. The result may appear "formalistic" in a given case to partisans of the measure at issue, because such measures are typically the product of the era's perceived necessity. But the Constitution protects us from our own best intentions: It divides power . . . among branches of government precisely so that we may resist the temptation to concentrate power in one location as an expedient solution to the crisis of the day.

*New York v. United States*, 505 U.S. at 187, 112 S.Ct. at 2434.

There is no constitutional mandate that the General Assembly enact a budget bill, and there is no statute providing for an alternative when it fails to do so. Despite much hand-wringing and doomsday forecasting by some of the parties to this action at the prospect that we would hold that Section 230 means what it unambiguously says, it is not our prerogative to amend the Constitution or enact statutes. When the General Assembly declines to exercise its appropriations power, that power does not flow over the "high wall" erected by Section 28 to another department of government.

The separation of the powers of government did not make each branch completely autonomous. It left each in some measure, dependent on the others . . . . Obviously, the President cannot secure full execution of the laws, if Congress denies to him adequate means of doing so. Full execution may be defeated because Congress . . . declines to make the indispensable appropriation . . . . If . . . adequate means are denied to the President, the fault will lie with Congress. The President performs his

---

5.  Those parties were permitted to withdraw from this litigation prior to oral argument.

full constitutional duty, if, with the means and instruments provided by Congress and within the limitations prescribed by it, he uses his best endeavors to secure the faithful execution of the laws enacted.

*Myers*, 272 U.S. at 291–92, 47 S.Ct. at 84 (Brandeis, J., dissenting). If the legislative department fails to appropriate funds deemed sufficient to operate the executive department at a desired level of services, the executive department must serve the citizenry as best it can with what it is given. If the citizenry deems those services insufficient, it will exercise its own constitutional power—the ballot. Ky. Const. §§ 31, 70.

■■■ Accordingly, we affirm that portion of the Franklin Circuit Court's judgment that declares the Public Services Continuation Plan unconstitutional insofar as it requires expenditure from the treasury of unappropriated funds other than pursuant to statutory, constitutional, and federal mandates; and reverse that portion of the Franklin Circuit Court's judgment that authorizes unappropriated expenditures for other "limited and specific services previously approved in *Quertermous.*"

GRAVES, JOHNSTONE, and WINTERSHEIMER, JJ., concur.

LAMBERT, C.J., concurs in part and dissents in part by separate opinion.

KELLER, J., concurs in part and dissents in part by separate opinion, with SCOTT, J., joining that opinion.

Opinion by Chief Justice LAMBERT, concurring in part and dissenting in part.

The power of the purse is the most potent assignment of power in our Constitution; for it provides the resources upon which all others subsist.[1] In this respect the power of the purse is akin to freedom of speech protected by the First Amendment, which is the most fundamental of all rights because freedom of speech is at the means by which all other constitutional rights are exercised.[2] For example, the right to exercise one's religion depends upon the right to speak freely. Likewise, the making of war, imprisoning of society's miscreants, and adjudicating cases and controversies—to name but a few—cannot be performed without the use of resources that reach the executive and judicial branches by way of legislative appropriations. And because of its potency, the power to withhold the purse has the ability, if untamed, to bring the other branches of government to their knees by depriving them of essential funds to carry out their constitutional mandates.

That is what this case is about: the power of the purse as articulated in Section 230 of the Constitution of Kentucky. Section 230 says that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law." But while Section 230 is at the heart of this case, it is not the only constitutional section implicated or necessary for proper resolution. For example, the separation of powers provisions[3] are also in play in a number of different ways, not least of which is the potential to use the appropriations clause to control the executive and

1. The Federalist No. 58, at 356, 359 (James Madison) (Clinton Rossiter ed.1961) (calling the power of the purse "the most complete and effectual weapon").

2. *E.g., De Jonge v. Oregon,* 299 U.S. 353, 365, 57 S.Ct. 255, 261, 81 L.Ed. 278 (1937)

("Therein lies the security of the Republic, the very foundation of constitutional government.").

3. KY CONST. §§ 27 and 28.

judicial branches of government. Practically, for the everyday Kentuckian, what is at stake is government itself. Without funds elections cannot be held, the Kentucky State Police cannot be called upon to serve and protect, there will be no reading, writing, or arithmetic instruction in public schools, and government will shut down. This is not merely a parade of horribles, but a real and natural consequence of omitted funding.

The majority begins its analysis of the appropriations power by citing Justice Hugo Black for the proposition that " 'Congress shall make no law' means Congress shall make no law." Applying that simple analysis to the language of Section 230, the majority asserts that a constitutional section means precisely what it says. But what the majority fails to acknowledge is that relatively no one agrees with Justice Black on this issue, and certainly no other Justice of the United States Supreme Court in the entire twentieth or twenty-first centuries agrees.[4] And even Justice Black himself cannot be considered an absolutist in the truest sense[5] because he upheld the criminalization of burning the American flag,[6] laws against picketing,[7] and prohibitions on wearing an armband to protest the Vietnam War.[8] Perhaps Justice O'Connor said it best: "The protections afforded by the First Amendment, however, are not absolute, and we have long recognized that the government may regu-

late certain categories of expression consistent with the Constitution."[9]

If one applied Justice Black's quasi-absolutist views, all laws against defamation, sexual harassment, threats of violence, and obscenity, and all laws regulating campaigns, corporate reporting, attorney advertisements and other commercial speech (just to name a few) would be stricken from the books as violative of the First Amendment. But no one agrees with that. Therefore, the views of Justice Black on the First Amendment have little to do with our analysis of Section 230. Only if the majority adopted an absolutist view of Section 230, which it does not, would the Justice Black quotation have persuasive effect.

Thus, while the majority tips its hat to an absolute standard it retreats when that standard becomes untenable. In retreat, the majority cleverly holds that when state statutes mandate spending, or when the federal Supremacy Clause[10] requires spending, or when other constitutional sections so require a de facto appropriation is made, dispensing with Section 230. And to a certain extent I agree. Let me first set out the situations with which I agree and then those with which I disagree. First, there are two types of statutes. One tells the treasurer to pay for services, and the other tells the treasurer how much to pay for services. Only the latter kind of statute can be truly deemed an appropria-

4. Steven Gey, *The Case Against Post–Modern Censorship Theory*, 145 U. Pa. L.Rev. 193 (1996).

5. *See* RODNEY SMOLLA, FREE SPEECH IN AN OPEN SOCIETY, 24 (1992); *see also* Patricia R. Stembridge, Note, *Adjusting Absolutism: First Amendment Protection for the Fringe*, 80 B.U.L.Rev. 907 (2000).

6. *Street v. New York*, 394 U.S. 576, 610, 89 S.Ct. 1354, 22 L.Ed.2d 572 (1969).

7. *NLRB v. Fruit & Vegetable Packers & Warehousemen*, 377 U.S. 58, 84 S.Ct. 1063, 12 L.Ed.2d 129 (1964) (Black, J., concurring).

8. *Tinker v. Des Moines Indep. Cmty. Sch. Dist.*, 393 U.S. 503, 517, 89 S.Ct. 733, 21 L.Ed.2d 731 (1969).

9. *See Virginia v. Black*, 538 U.S. 343, 360, 123 S.Ct. 1536, 1548, 155 L.Ed.2d 535 (2003).

10. U.S. CONST. art. VI, cl. 2.

tion. The majority opinion states it thusly: "Only those statutes specifically mandating that payments or contributions be made can be interpreted as self-executing appropriations. A mandated appropriation cannot be inferred from the mere existence of an unfunded statute." In other words, the statute that calls for a $50 payment to the dog-catcher is an appropriation, but the statute that merely calls for the dog-catcher to be paid is not.

I also agree with the majority's analysis of the federal Supremacy Clause. It states that "[t]he Supremacy Clause ... requires compliance with any federal mandates made in pursuance of the United States Constitution, notwithstanding Section 230 of the Constitution of Kentucky.... the Treasurer must fund such mandates." It couldn't have been said better.

However, I disagree with the analysis of funding required by various constitutional sections. Before explaining that disagreement I pause to note that while I agree with the result, I strenuously disagree with the reasoning to that result. And, as in most aspects of life, the reasoning is important. In this case, it is particularly important because when one accepts the notion that Section 230 is not to be read in an absolute, trump-all-other-sections-of-the-Constitution fashion, the analysis leads to a more expansive ultimate result. Now, to the disagreement.

The majority says that all constitutional sections dealing with funding are de facto appropriations. "In the absence of appropriations by the General Assembly, the Treasurer must fund these constitutional mandates at no more than existing levels until the General Assembly provides otherwise." Aside, for now, from the utter lack of authority for such a spending limit at "existing levels," there are a number of problems otherwise. Essentially, there are four types of constitutional spending sections. First, there are those that require the General Assembly to meet a constitutional standard of spending. An example of this is Section 183, which states that "[t]he General Assembly shall, by appropriate legislation, provide for an efficient system of common schools throughout the State." This section requires further action by the General Assembly and gives no guidance as to the required amount of funding. A second type of constitutional section does not call for the General Assembly to do anything, but requires some amount of funding. Section 221, dealing with the militia, is an example of this type. It states that that "the militia shall conform as nearly as practicable to the ... armies of the United States." This section does not call for action by the General Assembly and does not give guidance as to the required funding. A third type is one that requires the General Assembly to provide a determinable amount of funding, such as Section 120. Section 120 deals with salaries for justices and judges, but specifically calls for action by the General Assembly even though the amount is determinable. Finally, there are those that do not call for the General Assembly to do anything, and by their terms require a determinable amount of funding. An example of this type is Section 96, which states that "[a]ll officers mentioned in Section 95 shall be paid for their services by salary, and not otherwise."

Only the fourth type of constitutional section can be truly regarded as an appropriation. It is the only one that meets both requirements of a constitutional appropriation, i.e., that the General Assembly is not required to do anything more and that the amount of money to be spent by the Treasurer is determinable. The other three types of constitutional sections are

not appropriations because they either require further action by the General Assembly or they do not provide sufficient guidance as to how much funding is required.

In effect, the majority interprets all of these sections to be appropriations, thus creating a vast inconsistency with absolutism. But the majority fails to acknowledge clear differences among the varying types of constitutional sections. I agree with the majority that some constitutional sections can be properly interpreted as appropriations, thus falling within the language of Section 230. However, I disagree with lumping them all together as one and the same. For instance, however desirable the outcome, it cannot be said that Section 183 is an appropriation because it requires the General Assembly to take further action and the amount is generally within its discretion. A simple hypothetical is illustrative. When a catcher gives the curve-ball sign to the pitcher, it is not a curve ball. It is a signal for a curve ball. Similarly, when the constitution gives the "appropriation sign" to the General Assembly, it is not an appropriation. It is a signal for an appropriation. Only the fourth type of constitutional section, as discussed above and of which there are few, is an appropriation.

Furthermore, what the majority's analysis of constitutional sections leaves behind the curtain is revealing, because it glosses over the sections that require action by the General Assembly. Telling Dorothy to pay no attention to the man behind the curtain did not change the fact that Oz had no resident wizard. By the same token, glossing over the constitutional sections that require further action by the General Assembly does not change the fact that

not all sections can be honestly interpreted as "appropriations made by law." An absolute interpretation of Section 230 would require disregard of the plain language of numerous other constitutional sections that specifically require action by the General Assembly. Disjoining the latter part of Section 183 ("provide for an efficient system of common schools") from its beginning ("The General Assembly shall, by appropriate legislation, provide") is to disallow Section 183 to mean what it says. The responsibility to comply with Section 183 is squarely on the General Assembly,[11] and it is not a self-executing provision.

So, while I agree with the majority's conclusion that the Governor can execute the requirements of the law as enunciated in (some) statutes, federal mandates made in compliance of the United States Constitution by way of the Supremacy Clause, and (some) Kentucky constitutional provisions, I disagree that all constitutional sections can be deemed to be appropriations without intellectual legerdemain. In my view the majority has presented a weak rationale for allowing executive spending for such things as education, and its rationale would not allow spending for elections or the Kentucky State Police. Nevertheless, other rationale achieve a similar, albeit more expansive, result with proper fidelity to the principle of comprehensive constitutional construction.

Analogous situations in history and other jurisdictions provide ample authority for unappropriated executive spending. The history of the appropriations clause does not suggest that it was intended as a power of the legislature as much as it was intended to ensure fiscal responsibility and accountability.[12] Justice Story noted that

---

**11.** *See Rose v. Council for Better Educ., Inc.,* 790 S.W.2d 186 (Ky.1989).

**12.** See J. Gregory Sidak, *The President's Power of the Purse,* 1989 Duke L.J. 1162 (1989), for a discussion of the history and meaning of the appropriations clause.

this was "apparent upon the slightest examination. It is to secure regularity, punctuality, and fidelity, in the disbursements of the public money." [13] Obviously, Justice Story was commenting upon the appropriations clause in the federal constitution, but it is clear that Section 230 of Kentucky's Constitution is derived from its federal counterpart.[14] Furthermore, the question presented has been considered by other jurisdictions, and in limited circumstances the appropriations power has given way to other compelling interests when a strict adherence to its literal language would violate separation of powers. It has been said that the constitution is not a suicide pact,[15] and must be interpreted to further its purpose of supporting the endurance of a representative republic.[16] Allowing the General Assembly to control the executive by way of the appropriations clause strikes at the heart of the purpose of separation of powers, especially in Kentucky where it is overwhelmingly expressed in Sections 27 and 28 of the Constitution. The logical extension of such an idea would be destruction of government.

When the ink on the Constitution was barely dry, the President of the Convention and the first President of the United States, George Washington, spent unappropriated funds to suppress the Whisky Rebellion.[17] Nine years later President Thomas Jefferson made perhaps the most important and controversial purchase in our nascent nation's history: the Louisiana Territory. He purchased this territory from France for $15 million "even though he had only received authorization from Congress ... in the amount of $2 million for the acquisition of New Orleans or West Florida." [18] More recently, the Supreme Judicial Court of Massachusetts was presented with the propriety of similar unappropriated spending, this time by the judicial branch. In *O'Coins v. Treasurer of the County of Worcester*,[19] the court stated that a judge may order unappropriated funds to be spent so that he may carry out the duties imposed upon him by the consti-

13. J. Story, Commentaries on the Constitution of the United States § 681, at 486 (1833) (R. Rotunda & J. Nowak eds.1987).

14. KY Const. of 1792 at VIII, § 3 (appropriations clause follows the federal appropriations clause verbatim).

15. *See, e.g., Terminiello v. Chicago*, 337 U.S. 1, 37, 69 S.Ct. 894, 93 L.Ed. 1131 (1949) (Vinson, C.J., dissenting) ("The danger is that if the Court does not temper its doctrinaire logic with a little practical wisdom, it will convert the constitutional Bill of Rights into a suicide pact.").

16. *See Higgins v. Prater*, 91 Ky. 6, 14 S.W. 910 (1890) (allowing imposition of a state tax for the benefit of a non-common school even though the constitutional provision in question stated that "any sum which may be hereafter raised in the state by taxation, or otherwise, for purposes of education, shall be held inviolate, for the purpose of sustaining a system of common schools."); *see also Stone v.*

*Pryor*, 103 Ky. 645, 45 S.W. 1136 (1898) ("In construing this provision of the constitution, ... the purpose should be to ascertain the intent of the framers of the constitution and the people who adopted it .... The object of construction, as applied to a constitutional provision, is to give effect to the intent of the people adopting it. In arriving at this intent, we should look to the history of the times, and examine the state of things existing when the constitution was framed and adopted. And it is competent for us to look at contemporary interpretation ...") (Waddle, J., dissenting); *In re Opinion of Judges of Court of Appeals*, 79 Ky. 621 (1881) ("it must be borne in mind that the constitution is to be construed as a frame of government, and its interpretation result, if possible, in a consistent whole").

17. *Supra* n. 13 at 1178–81.

18. *Id.* at 1248.

19. 362 Mass. 507, 287 N.E.2d 608 (1972).

tution.[20] In holding that the appropriations section of that state's constitution was subservient to other constitutionally required mandates, the court noted that "[i]t is not essential that there have been a prior appropriation to cover the expenditure."[21] This holding is consistent with other jurisdictions that have been presented with similar questions.[22]

As shown above, a non-absolutist interpretation of the appropriations clause is not novel in the least. And just as in the context of the First Amendment, we are not confined to literalism when to so interpret would neither comport with the purpose of the clause or its history, or the legitimate ends of government. Constitutional interpretation must be upon the whole of the document, tempered by the accumulation of historical occurrences and the wisdom gained from those accounts. And what that history has taught is that—to sustain the welfare of the people—there must be some practical application.

This is not to say that the Governor may infringe upon what is constitutionally delegated to the legislative branch of government at will. Rather, such an allowance only arises on the heels of failure of the General Assembly to either appropriate funds that are necessary for the executive branch to faithfully execute the laws[23] or even to pass a statute that sets forth what shall happen in the event that necessary appropriations are not made. What the Governor did here was not an encroachment upon the appropriations power of the legislature in violation of separation of powers; the violation of separation of powers occurred when the legislature encroached upon the functions of the executive by failing to appropriate funds necessary for the Governor to perform his constitutional obligations. The response by the Governor in adopting a spending plan was the only rational option.

So the principle by which the Governor may spend unappropriated funds—those which are required by the constitution but may not be properly deemed constitutional appropriations—is in the performance of his constitutional obligation to see that the laws are faithfully executed. This result is consistent with the purpose, history, and spirit of the appropriations clause; fulfillment of separation of powers principles by not allowing the legislature to handcuff the other branches of government; and the role of government in promoting the advancement of a representative republic to secure the liberty of the people.

So that leaves me in agreement with the majority's destination for the most part, but disagreeing with its path. I agree that statutes directing payment of a specific sum are properly considered appropriations pursuant to Section 230 of the Constitution of Kentucky. I also agree that funding required by the Supremacy Clause may be deemed appropriations pursuant to Section 230. However, when it comes to the constitutional sections I would go further and allow an executive spending plan. The Governor clearly can spend to satisfy those constitutional sections that require any spending because the General Assembly failed in its express duty to do so. As for the constitutional sections that call for a determinable amount of funding, the Governor is restricted to the determined

20. *Id.* at 611–12.

21. *Id.* at 612.

22. *E.g., Morgan County Comm'n v. Powell,* 292 Ala. 300, 293 So.2d 830, 849 (1974); *Carroll v. Tate,* 442 Pa. 45, 274 A.2d 193, 197 (1971).

23. KY CONST. § 81.

amount. And as for the constitutional sections that require undetermined funding, the Governor may spend whatever he deems appropriate, subject to Section 2 of the Constitution of Kentucky. In coming to an appropriate amount of funding for these uses, the Governor may look to prior legislative budgets. However, contrary to the majority's contention, I find no authority that would require him to so look to or be constrained by prior budgets. Obviously, spending consistent with prior appropriations is not arbitrary or in violation of Section 2.

Neither the majority nor I would adhere to a strict absolutist interpretation of Section 230. Therefore, our disagreement is only a matter of degree. Under the majority view, the people of the Commonwealth will not be protected by the Kentucky State Police, and more objectionably, the ballot box will be shut. In other words, the General Assembly could prevent elections by refusing to pay the cost. By the majority opinion, this unreasonable result will come to pass the next time the General Assembly fails to enact appropriations. A more reasonable construction of Section 230 would protect the legislative authority to enact appropriations, while at the same time recognizing that the people's business must continue when the General Assembly defaults in its constitutional duty to pass appropriations. Such an interpretation would also permit two additional sources of executive spending.

First, it is important to recognize that the power to fund what is required by the constitution includes the power to fund the necessary incidentals to those functions.[24]

For instance, Section 74 states, among other things, that the Governor shall receive compensation for his services. But included are necessary and proper expenditures to effectuate the Governor's services, such as secretaries, advisors, state police, etc. Similar common sense extensions have been recognized by this Court. For example, in *Kentucky Human Rights Commission v. Pendennis* we held that implicit in the power to make determinations was the power to investigate.[25] Such expenditures would not be allowed by the majority.

Second, the Governor always retains the right to meet genuine emergencies, whether the General Assembly appropriates money for that purpose or not.[26] To some, this may seem to abrogate the powers of the legislature even when it is not derelict in its constitutional duties to appropriate for legitimate purposes. Let me attempt to assuage those fears. Genuine emergencies are exceedingly rare. Destruction of a bridge by an earthquake would be a genuine emergency that government must be able to confront with or without legislative appropriations for that purpose. But responding to exceptionally high traffic on a bridge would not be such an emergency. Astonishingly, the majority has specifically overruled *Miller v. Quertermous,* which allowed the Governor to respond to colossal and immediate emergencies. Section 230 cannot mean that in such a genuine emergency the Governor may only call the legislature back into special session, but be otherwise impotent. Such an interpretation has the very real potential to lead to a cataclysmic result.

**24.** *M'Culloch v. Maryland,* 17 U.S. (4 Wheat.) 316, 4 L.Ed. 579 (1819) (allowing establishment of National Bank even though it was not an enumerated power because it was an appropriate means of exercising an expressly enumerated power).

**25.** 153 S.W.3d 784, 788–89 (Ky.2004). *See also Strong v. Chandler,* 70 S.W.3d 405 (Ky. 2002).

**26.** *See Miller v. Quertermous,* 304 Ky. 733, 202 S.W.2d 389 (1947).

In sum, I would allow the executive to spend in furtherance of five categories. First, spending should be allowed to effectuate statutes that call for a specified sum of money to be spent. Second, there should be spending in furtherance of the federal Supremacy Clause. Third, spending to fulfill constitutional mandates should be permitted. Fourth, there should be a common-sense extension for necessary incidentals. And finally, the executive should have the power to meet genuine emergencies that threaten the welfare of citizens of the Commonwealth.

Those who believe that this opinion allows too great an encroachment upon power constitutionally assigned to the legislature should be reminded that there are two remedies. The General Assembly may act in accordance with what is contemplated by the constitution and the electorate and appropriate money to operate the government. In the alternative, it may enact statutes that outline how the government is to operate when the legislature is unable to pass appropriations bills. The power to appropriate money is a power properly belonging to the legislature. However, if it does not fulfill its constitutional duty, others must.

Opinion by Justice KELLER, concurring in part and dissenting in part.

While I concur in the majority opinion insofar as it reads Section 230 of the Kentucky Constitution as strictly limiting expenditures from the state treasury to instances where appropriations have been made by law, I must respectfully dissent because the majority opinion construes so-called federal mandates and state statutory and constitutional directives to implement programs by passing further legislation as "appropriations" sufficient to allow payment from the state treasury.

The majority opinion cites a variety of federal statutory schemes that allegedly require the states, including Kentucky, to spend money,[1] describing these as "federal mandates." The majority opinion claims that it does not directly address the issue of federal mandates, but it nonetheless claims that the Supremacy Clause of the United States Constitution could require that any such mandate be funded regardless of Section 230 of the Kentucky Constitution. But any actual mandate that the states enact a regulatory scheme, and thus spend money, is unconstitutional. As the United States Supreme Court noted in *New York v. United States*,[2] "the Framers explicitly chose a Constitution that confers upon Congress the power to regulate individuals, not States."[3]

In *New York*, the Court was faced with the question of the constitutionality of parts of a federal regulatory scheme aimed at controlling low-level radioactive waste. The Court upheld the provisions pairing the right to choose whether to comply with an incentive to comply. The Court noted that conditions may be attached to the receipt of federal funds.[4] The Court also noted: "[W]here Congress has the authority to regulate private activity under the Commerce Clause, we have recognized Congress's power to offer States the

1. *See, e.g.,* 29 U.S.C. § 651 *et seq.* (Occupational Safety and Health Act of 1970); 30 U.S.C. § 1201 *et seq.* (Surface Mining Control and Reclamation Act of 1977); 33 U.S.C. § 1251 *et seq.* (Clean Water Act); 42 U.S.C. § 6901 *et seq.* (Resource Conservation and Recovery Act of 1976); 42 U.S.C. § 7401 *et seq.* (Clean Air Act).

2. 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992).

3. *Id.* at 166, 112 S.Ct. at 2423.

4. *Id.* at 167, 112 S.Ct at 2423.

choice of regulating that activity according to federal standards or having state law pre-empted by federal regulation." [5] The Court cited, either directly or by citing to cases addressing the statutes, the Surface Mining Control and Reclamation Act, the Occupational Safety and Health Act of 1970, the Resource Conservation and Recovery Act of 1976, the Clean Water Act—all of which the majority opinion in the present case cites and describes as federal mandates—as examples of this second type of allowable incentive programs, or "program[s] of cooperative federalism." [6] In upholding these incentive approaches, the Court observed that compliance by the states was *voluntary:*

> By either of these methods, as by any other permissible method of encouraging a State to conform to federal policy choices, *the residents of the State retain the ultimate decision as to whether or not the State will comply.* If a State's citizens view federal policy as sufficiently contrary to local interests, they may elect to decline a federal grant. If state residents would prefer their government to devote its attention and resources to problems other than those deemed important by Congress, they may choose to have the Federal Government rather than the State bear the expense of a federally mandated regulatory program, and they may continue to supplement that program to the extent state law is

not pre-empted. Where Congress encourages state regulation rather than compelling it, state governments remain responsive to the local electorate's preferences; state officials remain accountable to the people.[7]

The Court distinguished between the true "incentive" provisions of the scheme and the outright commands to regulate when it addressed the provisions requiring the states either to take ownership of radioactive waste or to regulate according to the instructions of Congress. The Court declared those provisions unconstitutional as violating the Tenth Amendment, noting succinctly: "The Federal Government may not compel the States to enact or administer a federal regulatory program." [8]

The Court revisited the issue of federal mandates in *Printz v. United States* [9] when addressing provisions of the Brady Handgun Violence Prevention Act that imposed requirements on state law enforcement officers. Again the Court struck down the provisions, stating "the Federal Government may not compel the States to implement, by legislation or executive action, federal regulatory programs." [10] The Court concluded by expanding its holding in *New York:*

> We held in *New York* that Congress cannot compel the States to enact or enforce a federal regulatory program. Today we hold that Congress cannot

---

5. *Id.* at 167, 112 S.Ct. at 2424.

6. *Id.* (quoting *Hodel v. Virginia Surface Mining & Reclamation Assn., Inc.,* 452 U.S., 264, 289, 101 S.Ct. 2352, 2366, 69 L.Ed.2d 1 (1981)).

7. *Id.* at 168, 112 S.Ct. 2408 112 S.Ct. at 2424 (emphasis added); *see also id.* at 167, 112 S.Ct. at 2424. ("This is not to say that Congress lacks the ability to encourage a State to regulate in a particular way, or that Congress may not hold out incentives to the States as a

method of influencing a State's policy choices. Our cases have identified a variety of methods, short of outright coercion, by which Congress may urge a State to adopt a legislative program consistent with federal interests.").

8. *Id.* at 188, 112 S.Ct. at 2435.

9. 521 U.S. 898, 117 S.Ct. 2365, 138 L.Ed.2d 914 (1997).

10. *Id.* at 925, 117 S.Ct. at 2380.

circumvent that prohibition by conscripting the State's officers directly. The Federal Government may neither issue directives requiring the States to address particular problems, nor command the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program. It matters not whether policymaking is involved, and no case-by-case weighing of the burdens or benefits is necessary; such commands are fundamentally incompatible with our constitutional system of dual sovereignty.[11]

While the full effect of these cases is unknown at this time,[12] surely a "mandate" from the federal government that requires a state to spend money from its treasury is the sort of improper impingement on state sovereignty that the Court rejected in *New York* and *Printz*. And as the Court noted in *New York*, many so-called "mandates;" including those cited in the majority opinion in this case, are actually just incentive programs that allow voluntary compliance by the states. By failing to pass a budget or to enact separate appropriations to fund participation in those programs, the General Assembly is choosing, albeit by default, not to participate. There is no federal requirement, operating through the Supremacy Clause or otherwise, that requires an expenditure of state funds for these programs. And there is little question that if actual federal mandates do

exist, they are not binding, and certainly do not supersede Section 230 of the Kentucky Constitution, because they are unconstitutional as a violation of the Tenth Amendment.

The majority also claims that there are a variety of Kentucky statutory and constitutional provisions that contain or constitute appropriations independent of the appropriations normally found in the biennial budget bill, but, in my opinion, there is simply no support for such a reading in the text. For example, the majority finds an inherent appropriation in KRS 18A.15(2), which provides that "[a]ppropriations shall be made from the general expenditure fund to the cabinet to meet the estimated pro rata share of the cost of administering the provisions of this chapter . . . ." But the language "appropriations shall be made" does not constitute an appropriation, i.e., the "setting aside [of] a sum of money for a public purpose";[13] rather, it is a command for appropriations to be made in the future, e.g., in a budget bill. This language is not sufficient to meet the requirements of Section 230, which allows payment only *after* an appropriation by law has been made.

As an example of this type of inherent appropriation in the Constitution, the majority points to Section 254, which provides that "[t]he Commonwealth shall maintain control of the discipline, and provide for all supplies, and for the sanitary conditions of the convicts . . . ." But again, the provision

---

11. *Id.* at 935, 117 S.Ct at 2384.

12. *See* Vicki C. Jackson, *Federalism and the Uses and Limits of Law: Printz and Principle,* 111 HARV. L. REV. 2180, 2205–06 (1998) ("The breadth of *Printz's* effect on other federal statutes is unclear, although a small number of statutes are clearly invalid under *Printz*."); *see also Printz,* 521 U.S. at 936, 117 S.Ct. at 2385 (O'Connor, J., concurring) ("[T]he Court appropriately refrains from deciding whether other purely ministerial re-

porting requirements imposed by Congress on state and local authorities pursuant to its Commerce Clause powers are similarly invalid.").

13. BLACK'S LAW DICTIONARY 110 (8th ed.2004); *see also* BRYAN A. GARNER, A DICTIONARY OF MODERN LEGAL USAGE 71 (2d ed.1995) (defining "appropriation" in part as "a public body's act of voting a sum of money for any of various public purposes").

contains no setting aside of money for this purpose and no command that the state make a payment. Section 254 only contains the command that the Commonwealth shall maintain discipline of and provide for the needs of prisoners. While there is little doubt that governments have some implied powers,[14] such implications must fail in the face of express constitutional and statutory provisions to the contrary. Were Section 245 of the Kentucky Constitution to exist in a vacuum, then the requirement that the Commonwealth provide for prisoners would surely imply the means to do so, i.e., the power to pay for guards, supplies, etc. But we must read Section 245, and the various other similar provisions cited by the majority, in light of Section 230, which eliminates any implied power to spend money from the state treasury absent an express "appropriation made by law." [15]

The majority also cites Section 183, which provides for the establishment and maintenance of public schools: "The General Assembly shall, *by appropriate legislation*, provide for an efficient system of common schools throughout the State...." [16] The majority interprets this as sufficient to constitute an appropriation for the purposes of Section 230, but this section simply does not direct that costs of establishing and maintaining the public schools be paid. In fact, the very language of Section 183 implies that the means for establishing and maintaining the public schools, which presumably includes payment for services, supplies, et cetera, are to be provided through other legisla-

tive action of the General Assembly. Again, this is a command to the General Assembly to do something; it is clearly not an appropriation. Reading an "appropriation" into this language contradicts the clear command of Section 230 that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law...."

By requiring that spending be allowed for those constitutional and statutory provisions at the level previously provided for in the expired biennial budget, the majority, in effect, reads into these statutory and constitutional provisions a holdover provision analogous to the continuation budget statutory scheme that was in place from 1918 until 1983 when it was repealed by the General Assembly.[17] But the statutory holdover provisions were repealed, and there is no actual constitutional provision applicable to the constitutional provisions that command certain programs to be enacted. This is most troubling because if the majority opinion is correct in inferring such a holdover capacity, then how can the General Assembly *ever* decrease the spending for such programs if a holdover provision is an inherent aspect of those constitutional provisions that impose a duty on the General Assembly? Either the command to make the expenditure is there, or it is not. And either the command to maintain spending levels at their previous level is there, or it is not. In the case of provisions like Sections 183 and 254, neither command is present.

This is not to say that these are the only statutory and constitutional provisions that

---

**14.** THE FEDERALIST No. 44, at 290 (J. Madison) (Robert Scigliano ed. 2000) ("No axiom is more clearly established in law, or in reason, than that wherever the end is required, the means are authorized; wherever a general power to do a thing is given, every particular power necessary for doing it is included.").

**15.** KY. CONST. § 230.

**16.** (Emphasis added.)

**17.** See KRS 45.120 (repealed 1983 by 1982 Ky. Acts, ch. 450, § 79).

require an end without providing for appropriations to supply that end. I simply offer these provisions as examples of the overreaching in the majority opinion. Section 230's command that "[n]o money shall be drawn from the State Treasury, except in pursuance of appropriations made by law" is a limitation on any implied powers that the Governor or the General Assembly might try to justify with reference to other sections of the Constitution.

Upholding the Constitution, be it State or Federal, is not merely the responsibility of the Judiciary; it is the duty of all three branches to carry out those fundamental mandates. Where the Constitution commands the General Assembly to do something, e.g., "[i]t shall be the duty of the General Assembly to provide by law, as soon as practicable, for the establishment and maintenance of an institution or institutions for the detention, correction, instruction and reformation of all persons under the age of eighteen years, convicted of such felonies and such misdemeanors as may be designated by law,"[18] it is the General Assembly's duty to follow that command by enacting positive law, including laws that appropriate funding, if necessary, for carrying-out its enactments. It is not the prerogative of the Executive to pick up the slack by following the command in the General Assembly's stead, and it is especially not the Judiciary's prerogative to order the General Assembly to follow the command.[19]

Admittedly, our Constitution contains various checks and balances among the three branches. For example, the Judiciary has the power to review and hold void unconstitutional laws; the General Assembly has the power to impeach civil officers; and the Governor has the power to veto legislation and to convene the General Assembly for special sessions. But our Constitution contains explicit separation of powers provisions.[20] As such, the power to remedy a failure by one branch of government to perform a duty explicitly assigned to it by our Constitution rarely lies in one of the other branches. Instead, the remedy for such a failure to act lies in the people themselves. If the various legislators are faced with the prospect of closing the schools[21] or of closing the prisons,[22] along with the attendant impact of those

---

18. KY. CONST. § 252.

19. *See THE FEDERALIST* No. 78, at 465 (Alexander Hamilton) (Clinton Rossiter ed., 1961) ("Whoever attentively considers the different departments of power must perceive that, in a government in which they are separated from each other, the judiciary, from the nature of its functions, will always be the least dangerous to the political rights of the Constitution; because it will be least in a capacity to annoy or injure them .... The judiciary ... has no influence over either the sword or the purse.").

20. *See* KY. CONST. § 27 ("The powers of the government of the Commonwealth of Kentucky shall be divided into three distinct departments, and each of them be confined to a separate body of magistracy, to wit: Those which are legislative, to one; those which are executive, to another; and those which are judicial, to another."); *id.* § 28 ("No person or collection of persons, being of one of those departments, shall exercise any power properly belonging to either of the others, except in the instances hereinafter expressly directed or permitted.").

21. *See* KY. CONST. § 183 (requiring that "[t]he General Assembly shall, *by appropriate legislation*, provide for an efficient system of common schools throughout the State," (emphasis added), without directing that costs of establishing and running those schools be paid).

22. *See* KY. CONST. § 254 (requiring that "[t]he Commonwealth shall maintain control of the discipline, and provide for all supplies, and for the sanitary conditions of the convicts" without providing for payment of those expenses).

closings on their constituencies, all due to a lack of funding caused by the failure to enact a budget or to enact appropriations, I believe that they will carry out the duties imposed on them by those constitutional provisions. If I am wrong and the legislators do not pay heed to those duties, then their constituents will likely exact a steep price at the polls at the next election. It is the people from whom all the power of this Commonwealth derives,[23] and in the end they are the ultimate check on each branch of our government.

SCOTT, J., joins this opinion, concurring in part and dissenting in part.

---

23. KY. CONST. § 4 ("All power is inherent in the people, and all free governments are founded on their authority and instituted for their peace, safety, happiness, and the protection of property. For the advancement of these ends, they have at all times an inalienable and indefeasible right to alter, reform or abolish their government in such a manner as they may deem proper.").